UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARK A. SCHIEFELBEIN, | |
| Petitioner, | Case No. 3:11-cv-00066 |
| v. | Judge Bernard A. Friedman |
| | Magistrate Judge Newbern |
| KEVIN HAMPTON,[1] Warden, | |
| Respondent. | |

To the Honorable Bernard A. Friedman, Visiting Judge

## REPORT AND RECOMMENDATION

On July 12, 2003, a jury convicted Petitioner Mark Schiefelbein of seven counts of aggravated sexual battery and one count of especially aggravated sexual exploitation of a minor, for which he is serving a thirty-two year sentence. (Doc. No. 19-3, PageID# 707–14; Doc. No. 19-9, PageID# 1920.) Schiefelbein filed this habeas corpus petition under 28 U.S.C. § 2254 on January 1, 2011. (Doc. Nos. 1, 39.) Respondent answered the petition (Doc. No. 18) and filed the state court record. (Doc. Nos. 19, 20, 29, 32.) Respondent does not dispute that Schiefelbein's petition is timely and that this is his first habeas petition related to this conviction. (Doc. No. 1, PageID# 12; Doc. No. 18, PageID# 227; Doc. No. 39, PageID# 6765.)

---

[1] When Schiefelbein filed this petition, Jim Morrow was the warden of Bledsoe County Correctional Complex. (Doc. No. 1, PageID# 3.) Kevin Hampton now holds that office. "The federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004 (quoting 28 U.S.C. § 2242). Accordingly, Kevin Hampton has been substituted as the proper respondent in this proceeding. Fed. R. Civ. P. 25(d); *Lane v. Butler*, 133 F. Supp. 3d 888, 889 n.1 (E.D. Ky. 2015).

Schiefelbein requests an evidentiary hearing to develop the factual grounds of his claims. (Doc. No. 39, PageID# 6785, 6792, 6796.) This Court need not hold an evidentiary hearing where "the record refutes the applicant's factual allegations or otherwise precludes habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). The Court must consider Schiefelbein's claims in light of the "deferential standards prescribed by [the Antiterrorism and Effective Death Penalty Act (AEDPA)]," under which a state court's factual findings are presumed correct subject to rebuttal by clear and convincing evidence. *Id.*; 28 U.S.C. § 2254(e)(1). Having carefully considered the amended petition and Respondent's answer, as well as the record of proceedings in the state courts, the Court finds that an evidentiary hearing is not required. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003). For the reasons offered below, the Magistrate Judge RECOMMENDS that the petition be DENIED.

## I. Procedural History

Schiefelbein's prosecution arose from allegations that, from the summer of 2001 to September of 2002, he repeatedly touched the vagina of his minor gymnastics student B.R., while she trained at his gymnastics studio. *State v. Schiefelbein*, 230 S.W.3d 88, 149–50 (Tenn. Crim. App. 2007) (*Schiefelbein I*); (Doc. No. 19-9, PageID# 1922). On November 12, 2002, the Williamson County (Tennessee) grand jury indicted Schiefelbein on three counts of child rape, seven counts of aggravated sexual battery, and one count of especially aggravated sexual exploitation of a minor. *Schiefelbein I*, 230 S.W.3d at 96; (Doc. No. 19-1, PageID# 379–89). On July 7, 2003, the first day of trial, the Williamson County Criminal Court (hereinafter, the trial court) granted the State's motion to sever the child rape counts. *Schiefelbein I*, 230 S.W.3d at 96. A jury convicted Schiefelbein of the remaining charges on July 12, 2003. (Doc. No. 19-3, PageID# 707–14.) The trial court sentenced Schiefelbein to twelve years for each conviction and ordered

consecutive service, resulting in an aggregate sentence of ninety-six years. (Doc. No. 19-4, PageID# 839–846.) Attorney Patrick Johnson represented Schiefelbein at trial. (Doc. No. 1, PageID# 13.)

Represented by attorney David Raybin, Schiefelbein filed motions for a new trial, a reduction of sentence, and a judgment of acquittal, which the trial court denied. (Doc. No. 19-5, PageID# 982–84; Doc. No. 19-6, PageID# 1149.) On January 7, 2005, he appealed to the Tennessee Court of Criminal Appeals (TCCA), which affirmed his conviction but reduced his sentence to thirty-two years. *Schiefelbein I*, 230 S.W.3d at 149–50; (Doc. No. 19-9, PageID# 1920; Doc. No. 39, PageID# 6765). On June 18, 2007, the Tennessee Supreme Court denied Schiefelbein permission to appeal. (Doc. No. 19-9, PageID# 2043.)

Represented by attorney G. Jeff Cherry, Schiefelbein then filed a Petition for Post-Conviction Relief in the Williamson County Circuit Court (hereinafter, the post-conviction trial court), alleging ineffective assistance of counsel. (Doc. No. 20-2, PageID# 2239–2253, 2258–74.) The post-conviction trial court found that Schiefelbein's trial counsel's representation had been deficient in several respects, but that those deficiencies did not prejudice Schiefelbein. (*Id.* at PageID# 2306–08.) The TCCA affirmed that judgment on appeal, and the Tennessee Supreme Court again denied permission for further review. *Schiefelbein v. State*, No. M2008-02467-CCA-R3-PC, 2010 WL 1998744 (Tenn. Crim. App. May 19, 2010) (*Schiefelbein II*).

On January 1, 2011, Schiefelbein filed a pro se petition for a writ of habeas corpus in this Court. (Doc. No. 1.) After retaining counsel, he filed an amended petition. (Doc. No. 39, PageID# 6761.) Schiefelbein then moved for summary judgment on his claim of judicial bias (Doc. No. 49), which the Court denied (Doc. No. 81). The remaining claims of Schiefelbein's amended petition are now before the Court.

**II.     Statement of Facts**

The TCCA summarized the evidence presented at trial as follows:[2]

Viewed in the light most favorable to the State, the proof at trial showed that B.R.,[3] born June 15, 1990, practiced gymnastics at Let It Shine Gymnastics in Franklin, Tennessee, where she was coached by the defendant. When the defendant opened his own gymnasium, Esprit Gymnastics,[4] in late 2000, B.R. and five other female students left Let It Shine Gymnastics to continue under the defendant's tutelage. The defendant referred to these 6 students as his "six pack."

B.R. testified that she was the defendant's "favorite" student, and he developed a close social relationship with B.R.'s family. He regularly joined them for dinner, movies, hockey games, holidays, and church services. The defendant received Christmas and birthday presents from the victim's family, and he bought presents for B.R., her mother, and her younger sister. B.R. testified that she had received other gifts from the defendant, and her fellow students "start[ed] not liking [her] and it made [her] sad."

During the summer of 2001, B.R. practiced gymnastics five days a week, and the following school year, she practiced four days a week. Typically, B.R. would wake at 6:15 a.m., and she would attend school from 8:30 a.m. until 3:15 p.m. Afterwards, she would practice gymnastics for approximately five hours, until approximately 9:00 p.m. when she would go home, complete her homework, and retire to sleep at 11:00 p.m.

The State's evidence showed that all of the charged offenses occurred during B.R.'s practice sessions at the gymnasium between the summer of 2001 and September of 2002. Evidence described Esprit Gymnastics' gymnasium and office layouts. The victim testified that the defendant touched her vagina while she was stretching on the "regular" floor[5] and on the rod floor, and he touched her breasts and made her touch his penis while they were in his office. B.R. explained that the majority of the touching took place on the rod floor. The rod floor is approximately one foot higher than the concrete regular floor, and carpet separates it from the concrete.

---

[2]     Footnotes 2–17 are quoted directly from the TCCA's opinion, but renumbered in the context of this opinion.

[3]     To protect the identity of minor victims of sex crimes, it is the policy of this court to refer to the victims by their initials.

[4]     The trial transcripts incorrectly refer to Esprit Gymnastics as "Espirit Gymnastics." We will use the correct spelling "Esprit."

[5]     We glean from the record that the "regular" floor is the large floor marked with boundary lines where gymnasts perform tumbling and floor exercises.

B.R. said, "[I]t's . . . a strip of floor[,] and it is very bouncy and easier to tumble on." B.R. and other State witnesses testified that a cabinet stood in an opening in the office wall.[6] From the parent-viewing area, individuals could see into the office through this opening if they leaned over the cabinet. The office also had a door.

B.R. stated that six to seven other students were present without their parents when the defendant touched her. The defendant stretched the students in a certain order, and he stretched them behind a purple and white mat. In the beginning, the defendant stretched B.R. first, but then he started stretching her last. She explained that on some occasions, he would stretch her twice, before and after the other students. She stated that the defendant would touch her after he stretched the other students and while the other students performed exercises on the bars and the trampolines.

B.R. recounted that the defendant first touched her vagina, over her leotard, while she was doing a frog stretch.[7] He pressed his hand onto her buttocks during the stretch and placed his fingers between her legs, onto her vagina. B.R. gave various estimates of the number of times she was touched. At trial she testified that the defendant touched her in this fashion over her leotard eight to 10 times. B.R. also stated that he touched her under her leotard during this stretch "a bunch of times." She recalled telling Brentwood Police Department Detective Adrian Breedlove, the case's lead detective, that the defendant had touched her vagina under her leotard approximately 30 times. She explained at trial that she was "distraught" during the interview with Detective Breedlove, and the defendant touched her under her leotard 15 to 17 times.

The defendant also touched B.R.'s vagina and had her pull aside her leotard during the straddle stretch[8] while she was training for level seven[9] competitions. She

---

[6]     B.R. testified that the opening was "patched . . . up." During the defendant's proof, Rob Tallman, a home builder, testified that the defendant asked him in June of 2002 to fill in the opening. He stated that in late August or early September the defendant enclosed the opening and asked him to finish the drywall.

[7]     We discern from the record that for a frog stretch, a gymnast lies on his or her stomach and puts his or her feet together. The knees splay to each side of the body, and the goal is for the entire body to be flat against the floor. B.R. demonstrated this stretch for the jury.

[8]     We discern that for a straddle stretch, a gymnast sits with his or her legs in a V-shape. The goal of this stretch is to have the legs wide and straight to the floor. B.R. also demonstrated this stretch for the jury.

[9]     B.R.'s mother testified that B.R. began training for level seven in the summer of 2001. B.R. testified that the sport of gymnastics is organized into 10 levels. Gymnasts begin competing at level four, and as they master harder skills, they compete at higher levels. The elite level exceeds the tenth level, and at this stage, gymnasts possess the skills necessary to compete in the Olympic Games.

testified that the defendant told her that he needed to see her vagina so he would know where not to touch her. B.R. complied because the defendant "gets really mad very easily." After she would pull her leotard aside, he then asked to touch her vagina to determine how it felt, so he would not touch her again. B.R. stated that she allowed him to touch her "[b]ecause he would get angry and [she] was his favorite and [she] didn't want him angry at [her]." B.R. and the defendant would then negotiate how many seconds he could touch her vagina, but he would count very slowly to extend the actual touching time. B.R. testified that he touched her with his "pointer finger," and she mimicked his finger's movement for the jury.

During the straddle stretch, the defendant would ask B.R. to rate on a scale of one to 10 how the touching made her feel. At first, B.R. told the defendant "zero because it didn't feel good to [her]. It made [her] feel violated." When the defendant accused her of lying, she provided a number to prevent him from becoming angry. B.R. explained that the defendant touched her vagina "basically every time" she did the stretch.

B.R. testified that the defendant routinely videotaped the students' "tricks," and he videotaped B.R.'s vagina twice while she did the straddle stretch. On the first occasion, he told B.R. that he had an idea that she would hate. Then he asked her if he could videotape her vagina, and she "finally gave in because [she] didn't like him being angry at [her]." The defendant directed B.R. to pull aside her leotard, and he placed the camera on the rod floor, positioned it in front of her, and videotaped her vagina. After this first videotaping, the defendant claimed that the previous tape "didn't turn out" and that he needed to videotape her a second time. He told B.R. that he needed to move her leotard. At first, she refused, but eventually, she pulled her leotard aside. After she moved her leotard, the defendant adjusted its position, and B.R. held it in place. The defendant placed the camera on the rod floor and videotaped himself touching B.R.'s vagina. She testified that his finger was "shaky." Sometime later, the defendant assured B.R. that he had destroyed these videotapes. He told her that he burned the film in a tuna can, and he smashed the remaining plastic parts with a hammer. He then threw the tuna can and the plastic in the trash.

After Thanksgiving of 2001, the defendant made B.R. touch his penis twice in the same day. B.R. stated that these incidents occurred in the winter because she remembered the defendant wearing "black squishy pants," and he only wore long pants in the winter. She remembered telling Detective Breedlove that the defendant wore "quilted shorts" when this occurred, but she testified at trial that now she "remember[s] clearly it was black pants." First, while near the uneven bars, the defendant asked B.R. to put her hand in his pocket because he had a "treat" for her. She refused, but later, while in his office, he made B.R. put her "hand in his pocket and squeeze his penis." The second time the defendant made B.R. touch his penis was later that same day. After he went to the restroom, he went to his office and called for B.R. She testified that she did not want to go into his office "because [she] thought something like that was going to happen." When she entered the office, the defendant exposed his penis. B.R. turned her head, and the defendant said, "You can touch it and squeeze it." B.R. told the defendant that she did not

want to touch his penis, but he grabbed her hand and made her touch it. She demonstrated for the jury the motion that the defendant instructed her to make. She stated that the defendant's penis looked "swollen," "purple," and "red," and it felt "hard" and "squishy."[10]

The defendant later apologized to B.R. He told her that he would buy her anything she wanted because he made her touch his penis. B.R. told him that she wanted a teddy bear, but she testified that she "was just kidding." The defendant gave B.R. a teddy bear, and B.R. told her mother that he gave it to her for helping coach other students.

In May 2002, the defendant touched B.R.'s breasts. She remembered that it was May because her mother noticed that she was starting to develop breasts on May 1. Her mother told her to remember this important date and to tell the defendant about her development. When B.R. told the defendant, he asked to see and touch her breasts. While in the defendant's office with the door closed, B.R. pulled her leotard aside, and the defendant touched her breasts. B.R. explained that her back was to the door and that the defendant was facing her.

In June 2002, B.R. began complaining of back pain. In the evenings, B.R.'s mother would place ice on B.R.'s back and give her Advil. B.R. continued to practice gymnastics during the following weeks although her back pain did not subside. B.R.'s mother testified that B.R. had "a couple of especially hard workouts," and she testified to one in particular. On July 1 or 2, the defendant telephoned B.R.'s mother and told her that B.R. needed to quit gymnastics because B.R. would not follow his instructions. She spoke with B.R. that evening, and B.R. told her that the defendant became angry when she refused to do back handsprings on the high beam because her back hurt. The defendant became enraged and left the gymnasium for approximately one and one-half hours. A 17-year-old gymnast supervised the students in his absence. B.R. informed her mother that she did not enjoy gymnastics and that she wanted to quit. B.R. testified that the touching was the real reason she wanted to quit.

B.R.'s mother admitted that she enjoyed watching her daughter practice gymnastics and compete, but she testified that she supported B.R.'s decision to quit. Therefore, she called the defendant the next day and told him that B.R. would not be attending practice and wanted to quit gymnastics. That evening, the defendant and Mia Yabut, B.R.'s friend and practice partner, drove to B.R.'s home in the tumble bus.[11] B.R. joined them in the tumble bus, and B.R. told the defendant she wanted to quit because she no longer enjoyed practicing gymnastics. B.R. testified that the defendant made Miss Yabut leave the bus and then asked if she wanted to quit because he was touching her. She confirmed that the true reason for quitting was

---

[10]     The record is unclear whether the office door was closed during these offenses.

[11]     According to the defendant's testimony, a tumble bus is a school bus with removed seats and miniature gymnastics equipment.

the touching. The defendant told B.R. that he would not touch her again. At some point, the defendant and B.R. went inside the house. B.R., her mother, and the defendant went to B.R.'s bedroom. The defendant begged B.R. not to quit gymnastics, and he cried. No decision was reached at that time.

Later in July, the defendant, B.R., and her parents met at the gymnasium again to discuss whether she would quit. B.R.'s mother testified that she wanted B.R. "to quit for the right reason." She did not want B.R. to quit because she was scared to do a trick or had a bad practice. B.R.'s mother testified that at the meeting, B.R. was "defiant, like [she] had never seen her before." B.R. testified that her mother encouraged her to try again. Her mother left the office because she was frustrated regarding B.R.'s defiant behavior and wanted her daughter to quit for, what she considered, an "appropriate reason." At this meeting, they failed to decide whether B.R. would continue practicing gymnastics.

While the defendant, B.R., and her parents continued to discuss B.R.'s involvement with gymnastics, a doctor examined B.R.'s back. The doctor determined that B.R. had fractured the L–5 vertebrae, and he prescribed that she wear a back brace for at least three months. The doctor later extended the time to four months. While B.R. wore the brace, she did not practice gymnastics. Instead, she worked sporadically at the gymnasium concession stand.

On September 7 or 8, 2002, the defendant went to B.R.'s house for dinner. After dinner, the defendant, B.R., and her two sisters searched for the family dog. During the search, B.R.'s oldest sister told the defendant that B.R. thought a certain young boy was cute. The defendant teased B.R., and she struck him in the head. B.R. explained at trial that she hit him because of the teasing and her pent-up anger from the touching.

After finding the dog and returning to the house, the defendant told B.R.'s mother that he was "extremely angry" with B.R., that she had hit him, and that he was going to leave "before he lost his cool." B.R.'s mother testified that she asked B.R. why she struck the defendant and why the defendant grew angry at B.R. "over seemingly insignificant things." B.R. told her mother that she had many reasons for hitting the defendant. Finally, B.R.'s mother asked, "[I]s he touching you inappropriately?" B.R. answered that he had touched her inappropriately. At trial, B.R. testified, over objection, that after she told her mother, her mother commented that "she kind of felt like something like that was going on."

B.R.'s mother testified that she hugged B.R. and told her that it would never happen again. When she asked B.R.[] where the defendant touched her, B.R. replied, "[h]er private spot." B.R. testified that she finally told her mother "[b]ecause [she] couldn't bear having it inside [her]." She stated that on several occasions, the defendant would tell her not to tell anyone because he "would get in trouble." B.R. believed she would "get in trouble for telling because [she] thought he would get angry at [her]."

The next morning B.R.'s parents contacted the police. B.R. and her parents met with Detective Breedlove at the Brentwood Police Department on September 10,

2002. Detective Breedlove conducted B.R.'s interview in a conference room equipped with video and audio recording devices, which he used to record the interview.[12] B.R.'s parents observed the interview on a closed circuit television. B.R.'s mother testified, over objection, that "[she] knew that [B.R.] was being totally honest. [B.R.] was telling [Detective Breedlove] exactly what happened." She further testified that B.R. acted "somber," but at times, she acted "silly . . . not like herself at all."

Detective Breedlove described B.R.'s demeanor as sometimes being "happy" and "friendly," but she then acted "stoic" and "flat." B.R. looked down and softened her voice when she described "sensitive subjects," and she "shudder[ed]" while describing certain incidents.

Detective Breedlove attended a second interview with B.R. Over objection, he testified that B.R.'s statements during the interviews and at trial regarding where the defendant touched her, when he touched her, and where she was while the defendant touched her were consistent. He explained that B.R. did not remember dates or the specific number of times the defendant touched her vagina, but she never wavered from her story.

Detective Breedlove testified on cross-examination that although B.R. varied the number of times that the defendant touched her vagina, he believed her testimony was consistent for a child. Detective Breedlove admitted that B.R. made a mistake when she told him that the defendant was wearing shorts when he exposed his penis. Detective Breedlove stated that after that mistake, B.R. consistently stated that the defendant was wearing black pants. He agreed, however, that B.R.'s testimony was "fairly inconsistent" regarding whether the defendant held the video camera or whether it was on the ground while he filmed B.R.'s vagina in the straddle-stretch position.

Subsequent to the September 10, 2002 interview, Detective Breedlove obtained search warrants for Esprit Gymnastics and the defendant's residence. On the evening of September 11 and prior to executing the warrants, Detective Breedlove visited B.R.'s home. With her parents' permission, B.R. agreed to place a "perp phone call" to the defendant. Detective Breedlove testified that the purpose of the telephone call was to gather information and possibly an admission from the defendant. In the presence of her parents and Detective Breedlove, B.R. telephoned the defendant at the gymnasium, and Detective Breedlove recorded the conversation.

During Detective Breedlove's testimony, the State played the recorded conversation for the jury and entered a transcript of the conversation into evidence. During this conversation, B.R. told the defendant that she was worried about him touching her "private spots." The defendant responded, "No, I'm not going to do that." B.R. also told the defendant that she was worried about the videotapes. The

---

[12]     The videotape was shown to the jury during Detective Breedlove's direct examination testimony.

defendant stated, "There [are] no video tapes." The two then argued over whether there are tapes of her "private spot." Then, the defendant stated, "I have no idea what you're talking about . . . ." B.R. replied, "You, just promise me you destroyed them, okay?" The defendant stated, "Whatever." After this response, they changed the subject, and at one point, the defendant spoke with B.R.'s mother. He failed to mention B.R.'s allegations. Eventually, the defendant spoke with B.R. again, and the telephone conversation ended without further discussion of the offenses.

After recording the telephone conversation, Detective Breedlove and other Brentwood Police Department personnel executed the search warrant first on Esprit Gymnastics and then on the defendant's residence. Initially, the defendant gave his consent to search the gymnasium, but he later revoked consent. Detective Breedlove produced the warrant, and the police searched the gymnasium. After this search, the defendant followed the police to his residence, and it was searched.

The police seized approximately 79 videotapes from the gymnasium and the defendant's residence. Detective Breedlove and two members of Project Alert,[13] viewed all 79 tapes. None of the 79 videotapes contained footage of B.R.'s uncovered vagina made while she performed the straddle stretch. Of the 79 videotapes, 25 were digital VHS tapes. Detective Breedlove testified that the 25 digital tapes contained practice routines of the defendant's students. Five of the 25 digital tapes, labeled A through E, focused on B.R.; the defendant focused the camera on "all three . . . of the victim's private areas." Detective Breedlove stated that the defendant "zoomed" the camera in on B.R.'s clothed vaginal area more than 200 times. He explained that some shots occurred when B.R. did a gymnastic skill, but many times, the defendant "zoomed" in on B.R.'s vaginal area when she was not doing anything of a "gymnastics nature."

In tape A, the defendant "zoomed" the camera in on B.R.'s vaginal area 81 times. In tape B, he focused on her vaginal area 84 times. In one of the 84 shots, B.R. was pushing a mat underneath another student doing a skill on the trampoline. At this point, her legs obstructed a view of her vaginal area. Detective Breedlove testified that as the defendant "zoomed" in on B.R., he stated her name and that she "better get that in, you're totally blowing it now." She placed the mat a couple more times, and the defendant stated her name again and said "hang on to the mat and get it in like you used to, please." B.R. changed positions making her vaginal area visible, and the defendant said, "better, thank you" and then stated the victim's name. Detective Breedlove testified that during another shot of B.R. on tape B, while she was lying down, the defendant was distracted by someone. He told the person to "give [him] a second" as he "zoomed" the camera in on B.R.'s vaginal area. Detective Breedlove testified that the defendant focused on B.R.'s vaginal area 69 times in tape C, five times in tape D, and three times in tape E.

---

[13]      Project Alert is a section of the National Center for Missing and Exploited Children. The members are mainly retired law enforcement officers. This organization assists police departments with investigations.

At trial, Lucy Fox, a judge and member of USA Gymnastics, the country's gymnastics governing body, reviewed several portions of videotape A. Referring to the "handstand straddle down" position, she stated that there is no gymnastic purpose for "zooming in" on the gymnast's vaginal area. She asserted that there was no gymnastic purpose for focusing on the gymnast's vaginal area when she pushed the mat under another gymnast who was flipping on the trampoline. Ms. Fox continually asserted the lack of any gymnastic purpose for each of the scenes she viewed.

Regarding spotting and stretching techniques, Ms. Fox explained that professional members of USA Gymnastics must pass a safety certification test based upon the *USA Gymnastics Safety Handbook*. The *Handbook* lists regulations for equipment and spotting techniques. Ms. Fox read the *Handbook*'s "Hand Spotting" section into the record.

> Hand spotting refers to a method of spotting where a coach places his or her hands on the gymnast, and lifts and manipulates and/or supports the gymnast in mastering a skill. Warning and consent documents should refer to the act of hand spotting and what it means. All spotting should result in minimal touching support, and athletes should be informed about the potential for touching while being spotted. Unnecessary touching should not be used particularly when the spotter is male and the gymnast is female. Gymnast and parents should be aware that from time to time a slip may occur and the gymnast will be touched on the buttocks, crotch or chest. The coach and gymnast should understand such touching is at a minimum and should not occur repeatedly.

> If the coach or instructor accidentally touches one of these areas, he/she should be sensitive to the situation and indicate that the touch was an accident by a brief apology and then return to instructions. When a coach/instructor is performing a rescue type spot, then concern about touching a private area is obviously trivial in comparison to the consequence of the unprotected fall.

Ms. Fox also explained that the private parts, the crotch, buttocks, and chest, are "no zones." She stated that there is no reason to touch the no zones, except possibly for a rescue spot. Rescue spotting is when the coach will "grab" the gymnast to protect him or her from injury. The coach prevents the gymnast from hitting his or her head, or the coach stops the gymnast's rotation.

Ms. Fox further explained how a gymnast performs a frog stretch, and she demonstrated the proper placement of the coach's hands while hand spotting in the stretch. She stated that "[n]o coach should place [his or her] fingers . . . between an athlete's legs." She testified that frog stretching is not related to rescue spotting.

Ms. Fox also testified that a coach should not place his or her fingers between a gymnast's legs while the gymnast performs the straddle stretch. She stated that the coach's fingers should be placed "towards [the gymnast's] legs diagonally or . . .

straight up towards [the gymnast's] head along [his or her] back." The hands should never rest on the inner thigh area.

On cross-examination, Ms. Fox explained that when a gymnast performs the frog stretch, a coach should place his or her hand "midway down [the gymnast's] tush," but "not cupping [the gymnast's] tushes." She stated that this is an exception to the "no zone" rule, but a coach should never touch the vaginal area of a student. Ms. Fox explained that TOPS testing, testing for gymnasts training for the elite track, examines gymnasts' strength and flexibility. During this testing, coaches take several measurements, one being from the gymnast's hip bone to the floor while in a split. She admitted that the coach touches the vaginal area, the hip bones, but the coach does not touch the vagina or the inner thigh. Ms. Fox testified that pictures of the cat leap position would show the crotch area, but it would also show the legs and feet for positional purposes. Finally, she stated that neither a student nor a coach would benefit gymnastically from watching videotapes that only show a gymnast's crotch.

On October 2, 2002, personnel at Our Kids Center evaluated B.R. Phyllis Thompson, a licensed social worker, testified at trial. She obtained B.R.'s medical history and explained the process of the medical examination. Ms. Thompson stated that this initial interview dictates the invasiveness of the physical examination.

Ms. Thompson testified that B.R. told her that she was having nightmares about the defendant. When Ms. Thompson asked her what the defendant did to her, B.R. replied that he touched her "private spot" many times. B.R. further stated that the defendant touched "the part she pees from—with his finger." B.R. was unsure whether he touched the inside or outside of her vagina. Ms. Thompson testified that B.R. stated that she felt pain when the defendant touched her "private spot," but B.R. did not bleed during or after the contact.

B.R. told Ms. Thompson that the defendant touched her breasts and made her touch his penis. She demonstrated the motion that she made during the contact and stated that nothing came out of the defendant's penis. Ms. Thompson testified that she failed to ask B.R. if she saw the defendant's penis.

After the grand jury indicted the defendant, Detective Breedlove, accompanied by other officers, arrested him at Esprit Gymnastics.

At trial, the defendant called seven witnesses, including the victim, and he testified on his own behalf. Three witnesses, Edmund Yabut, M.D., Dee Ann Melton, and Michelle Day, whose children practiced under the defendant, testified concerning the defendant's good character. They also described his coaching style as "aggressive," "intense," or "devoted" and explained that the defendant did not have a policy that limited parents' access to the gymnasium floor or the defendant's office. Defense witness, Rob Tallman, who also was a parent of a student, testified concerning the opening in the defendant's office wall. In addition, the defendant called Brentwood Police Department Corporal Melissa Westbrook, who conducted the initial interview of the victim. Mia Yabut, Edmund Yabut's daughter and B.R.'s practice partner, testified on the defendant's behalf.

The defendant testified that he moved to Tennessee from California after accepting a job as the director of the girls' team program at Let It Shine Gymnastics. While coaching at Let It Shine, he moved B.R. into his training group, and soon after the regrouping, he met B.R.'s family.

After coaching six months at Let It Shine Gymnastics, the defendant was fired, according to him, because he and the owner disagreed over the running of the girls' team program. Instead of returning to California, the defendant opened his own gymnasium, Esprit Gymnastics, at the request and with the help of three families, the Yabuts, Yepezs, and Meltons. B.R.'s family joined the efforts by contributing money. On December 8, 2000, B.R. and the other "six pack" members, Mia Yabut, Lilly and Andy Yapez, Jordan Melton, and Catherine Traxler began training at Esprit Gymnastics under the defendant's tutelage.

The defendant described B.R. and his relationship with her. He testified that B.R. had "ability in gymnastics." In addition, he stated that she was fearful, and this fear hindered her gymnastic development. The defendant said that B.R. was not "tough" and that none of the girls were, and as a coach, he had to "maximize [the girls'] strengths; . . . minimize their weaknesses." Thus, he described his coaching style as "aggressive." The defendant admitted that he developed more of a friendship with B.R. than the other girls because he "was over at [her] house more." He stated that this friendship interfered with his coaching and may have caused other students to quit practicing at his gymnasium.

Four defense witnesses, Dr. Yabut, Miss Yabut, Ms. Melton, and Ms. Day, described the defendant's and B.R.'s relationship. Doctor Yabut testified that B.R. "grabbed [the defendant's] attention all of the time." He stated that the relationship did not concern him until his daughter complained of a lack of attention from the defendant. Doctor Yabut also testified that he thought the female students had "crush[es]" on the defendant and that his daughter was jealous of B.R. Miss Yabut confirmed her father's opinion and admitted that she was "a little jealous of [B.R.'s] attention." She testified that the defendant would talk to B.R. more than he would the other students. Another defense witness at trial, Ms. Day, described the relationship, and she testified that she thought B.R. "had a little bit of a crush on [the defendant]." She testified that B.R. would walk up to the defendant and put her arms around his shoulders, or she would sit down with him and engage in conversation. Ms. Day testified that the defendant would ignore B.R., undrape her arm, and direct her to go perform a skill. Ms. Melton testified that B.R. "had a crush on [the defendant]." She testified that B.R. adored the defendant, and "[i]t was obnoxious" and "a huge annoyance."

The defendant testified to the size and layout of the gymnasium and office area. He stated that from the parent viewing area, all areas of the gymnasium were visible except the bathrooms and a portion of the rod floor where the hot water heater sits. He also explained that the office door would not close or lock, and he described the opening in the office wall, testifying that the opening was "90 inches tall or so, 65 inches wide." The defendant stated that he was never in his office alone with the door closed with B.R. or with any other student. Rob Tallman testified that in late

August or early September the defendant closed the opening and asked him to finish the drywall.

The defendant denied touching B.R.'s vagina while she performed the frog stretch. He explained that the purpose of the stretch is to gain strength and flexibility, mainly for balance beam skills. He elucidated that frog stretches affect "hip turnout" and pelvic tilt. When students perform the frog stretch, coaches forcefully push downward on the buttocks to increase the stretch. The defendant stated that during the stretch, the student's hips rotate and the private area is underneath him or her "flat on the ground." He explained that "there is really nowhere for [a coach's fingers] to go." Thus, he asserted that he never knowingly or accidentally touched B.R.'s vagina during the frog stretch.

Ms. Melton, Ms. Day, and Miss Yabut testified regarding stretching. Ms. Melton testified that a mat was "not necessarily" in the vicinity of the stretching. Both Ms. Melton and Ms. Day testified that neither one became alarmed when watching the defendant stretch B.R. Miss Yabut testified that she and other students practiced on the trampoline while the defendant stretched B.R. on the rod floor. She testified that she would watch the defendant stretch B.R. because she was jealous of the attention the defendant showed B.R. Miss Yabut also stated that she never saw the defendant inappropriately touch B.R. during the stretches.

The defense called B.R. to clarify where she was located on the rod floor when the defendant touched and filmed her vagina as she performed the straddle stretch. B.R. used a diagram she had drawn in a previous interview and identified the front of the gymnasium on the diagram. According to the diagram, her feet pointed toward the right wall.

On cross-examination, the State asked further questions regarding her location, and B.R. testified that she drew the diagram "from . . . if you look down." She further testified that her back was to the wall with mirrors. We discern from the record that the mirrored wall is the left wall of the gymnasium.

The defendant explained that B.R. had a fear of doing certain skills on the beam, namely the back walk over and the back handspring. On July 1, 2002, B.R. was scared to perform the back handspring, so the defendant explained that as part of his coaching strategy, he left the gymnasium. He stated that if he "remove[d himself] from the environment," then B.R. would want to perform the skill. He left a 17-year-old coach in charge of the students while he shopped at Home Depot. At this point, he telephoned B.R.'s mother and reported the incident. Upon returning to the gymnasium, he learned that B.R. had performed the skill, and at his request, she demonstrated it twice more.

Although Ms. Melton did not witness this incident, she testified to its occurrence.[14] She then testified that "B.R. was crushed because [the defendant]

---

[14]     Ms. Melton testified to the incident on direct examination. On cross-examination, the State elicited that she had not personally witnessed the event. The State moved to strike her prior testimony. While the trial court and counsel discussed the motion, Ms. Melton interrupted them

basically chose gymnastics over what she thought their relationship was." She explained that from that day forward, B.R. did not look at or speak to the defendant. She testified that B.R. made excuses for why she could no longer participate in gymnastics, and Ms. Melton testified that B.R.'s back injury, in her opinion, was not legitimate.

The defendant testified that B.R.'s mother telephoned him on July 2, 2002, and informed him that B.R. would not be attending practice. On July 3, the defendant and Mia Yabut arrived at B.R.'s home in the tumble bus. The defendant stated that Miss Yabut and B.R. played in the tumble bus while he showed B.R.'s mother the tumble bus's new generator, which B.R.'s mother had purchased. After B.R.'s mother returned inside the home, the defendant, Miss Yabut, and B.R. remained on the bus until Miss Yabut announced that she was going inside. Miss Yabut testified at trial that she left the bus "[b]ecause [she] thought they wanted to talk alone for a while." The defendant and B.R. then talked about her quitting gymnastics. The defendant testified that he encouraged her to keep participating. He stated that the conversation "centered around" "another skill on bars that she was particularly fearful of." He testified that B.R. never told him that she wanted to quit because he was sexually abusing her.

After Miss Yabut returned to the bus, the three went inside B.R.'s house. In B.R.'s bedroom, the defendant, B.R., and her mother discussed her future in gymnastics. The defendant stated that he, B.R.'s mother, and B.R. all cried during the conversation, and he did not testify whether B.R. made a decision to quit that night. The defendant, B.R., and her parents continued to discuss her gymnastics future throughout July, August, and September.

Defense witness Corporal Westbrook's testimony regarded her September 9, 2002 interview with B.R. Corporal Westbrook was the first Brentwood Police Department employee to interview B.R. after her parents contacted the police. Corporal Westbrook explained that she was the initial responding officer, and she did not question B.R. "per se." Eight days after the interview and at the request of Detective Breedlove, Corporal Westbrook wrote a supplemental report of this interview. She testified that B.R. told her that the defendant touched her breasts and vagina. She further testified that her report stated that "[B.R.] advised that [the defendant] had touched her breasts several times, too."

On cross-examination, Corporal Westbrook testified that the interview's purpose was to determine whether to investigate the allegations further. She stated that she wrote the report from cursory notes, and B.R.'s description of the breast touching "was just more fleeting than anything."

The defense called B.R. to testify regarding this issue, and B.R. stated that she told Corporal Westbrook that the defendant touched her breast "once for sure." She

_____

four times, and the court had to instruct her to stop testifying. The trial court then denied the State's motion.

further testified, "I think I said several for him touching my vagina. I never said—I don't think I said several for him touching my breasts."

Two days after the September 9, 2002 interview, B.R. telephoned the defendant at the gymnasium. The defendant stated that he was teaching class at the time of the telephone call. He explained that during the conversation, he was preoccupied with his students. When B.R. told him that she was worried about him "[t]ouching [her] in [her] private spots," the defendant replied, "No, I'm not going to do that." He further testified that he "had never done that." The defendant explained that he was "shocked" by the comment and uncertain how to react. At trial, he denied filming and touching B.R.'s vagina, and he stated that he ended the telephone conversation with "[w]hatever" because he refused to continue this conversation over the telephone. The defendant then spoke with B.R.'s mother. He explained at trial that he failed to discuss B.R.'s allegations with her mother because it was inappropriate to do so over the telephone.

On cross-examination, the State played the audiotape of the telephone call for the jury. The defendant agreed that on direct examination he testified that he "was shocked and caught off guard" by B.R.'s allegations during the telephone call. After hearing the audiotape, the defendant testified that "[s]hock and caught off guard may not be distinguishable in [a person's] voice."

Shortly after B.R. placed the September 11, 2002 telephone call, the police entered the gymnasium and spoke with the defendant in his office. After another coach finished the students' workouts and they left, the police searched the gymnasium. Afterwards, the defendant followed the police officers to his apartment where they continued searching. Because of the searches, the defendant explained that he never had the opportunity to discuss the allegations with B.R. and her mother. He agreed that the police seized several videotapes filmed by him.

At trial on cross-examination, Ms. Melton viewed, we surmise from the record, videotape A. She agreed that the videotape showed her daughter's crotch area while she was not performing a gymnastic skill, and Ms. Melton testified that the defendant "is really interested in anatomy." She testified that the defendant's purpose was to analyze "hip placement." Ms. Melton further testified that during the investigation, Detective Breedlove showed her a videotape with a close-up shot of her daughter's crotch,[15] and "maybe [she] did" tell Detective Breedlove that portions of the videotape were inappropriate. However, she testified that the videotape she viewed at trial did not "bother [her] whatsoever."

She viewed another scene on videotape A that showed a close-up of B.R.'s vaginal area and buttocks while she pushed a mat under another student performing a trick on the trampoline. Ms. Melton testified that the defendant would not film his students other than for gymnastics purposes. In response to Ms. Melton's answer, the State showed Ms. Melton two other scenes on the videotape outside of the jury's presence. Once the jury returned, Ms. Melton described what she saw. She testified

---

[15] The record is unclear whether the videotape she viewed with Detective Breedlove was videotape A.

that the scene showed the gymnasium's bathroom, and it showed that the defendant walked to the toilet, pulled down his shorts, sat on the toilet, and then wiped himself from the front. In the next scene, Ms. Melton agreed that the video camera was wrapped in a black material, and there was a hole in the material for the lens. She stated that "someone" came into the camera's view. When the State asked her if she noticed that the person's clothing changed to a "nude shade," she replied, "I'm not putting it together. I'm really not." She admitted that the person sat down on the toilet as the defendant did in the previous scene, but she stated that she was not sure whether the person reached for toilet paper. After testifying to the contents of these scenes, she still contended that the defendant "wouldn't tape the girls for any other purpose other than gymnastics."

At trial, the defendant also reviewed portions of the videotapes. First, the defendant explained that the shots were of B.R.'s "pelvic area," not vaginal area. He commented that the focusing on B.R.'s pelvic area while she pushed a mat under another gymnast served gymnastic purposes, including the study of biomechanics, teaching tools for students, and teaching tools for coaches. He disagreed with Ms. Fox's testimony that the videotapes serve no gymnastic purpose and explained that he is a "minority in the coaching community" because of his "cutting edge" techniques. The defendant stated that the purpose of the close-up, pelvic shots of B.R. while she stood at the wall was to teach her the "Staulder press." He further explained that B.R. cannot perform a "Salto up," so he instructed her to perform "Salto downs." By focusing the camera on her pelvic area when she performs certain skills, he could analyze whether B.R.'s body position was biomechanically correct, namely her pelvic tilt.

At the end of his direct examination testimony, the defendant denied touching and filming B.R.'s vagina for sexual gratification purposes. He further denied touching her breasts for sexual gratification.

Regarding the bathroom scenes in videotape A, the defendant testified on cross-examination that he filmed the first scene on July 21, 2001, at 10:43 p.m. He admitted that the camera sat on a "drawer thing" in the bathroom of the gymnasium. He agreed that he paced in the camera's view, and then he walked to the toilet, pulled down his shorts, sat on the toilet, and then wiped himself from the front. The defendant further agreed that he filmed the second bathroom scene a few hours later at 4:26 a.m. He admitted that he surrounded the camera with black trash bags, the roll of extra trash bags being visible in the scene, and there was a hole for the lens. The defendant did not admit that he took his clothes off when the State asked him if he became "totally skin colored," but he agreed that he sat on the toilet and wiped himself from the front. After this portion of testimony, the State showed the videotape to the jury. The defendant contended that he did not attempt to covertly videotape students in the bathroom; he testified that he videotaped himself.

In rebuttal, the State called Andy Yepez, a former member of the "six pack," and she testified that the defendant stretched B.R. differently from the other students. The defendant placed his hands on B.R.'s buttocks instead of "on the side" of the back, as he did with every other student. Miss Yepez testified that when he stretched

B.R., her view was frequently obstructed by a mat, and parents usually were not present. She admitted that the defendant stretched all students behind the mat and on the same place on the rod floor, but he stretched B.R. longer than he did the other students. The defendant stretched her for 30 seconds to one minute, but he stretched B.R. for approximately 10 minutes.

The State also called Nancy Westman, mother of one of defendant's former students. Ms. Westman described the defendant's and B.R.'s relationship. She testified that the defendant "favored" B.R.; "[h]e spent more time with her, and he hugged [B.R.] more than the other students." Ms. Westman stated that "[t]hey gave each other back rubs," and the defendant did not do this with other students. She testified to one occasion when the defendant and B.R. were tickling each other. Ms. Westman described the interaction as "a boyfriend/girlfriend type relationship, like 16 year olds would act when [they're] dating."

Ms. Westman also described an interaction between B.R. and the defendant while they, along with other gymnasts and their family members, were on a 15-passenger van in San Diego, California. Ms. Westman testified that she and Ms. Melton sat behind B.R.'s mother and in front of B.R. and the defendant. She heard B.R. "kind of squirming," and B.R. said, "[N]o, [the defendant's name], no, just on my face." Ms. Westman turned around and observed the defendant tickling B.R.'s face. He then rubbed down her arm, eventually onto her leg and thigh. Ms. Westman testified that she heard B.R. state to just touch her face several times. She stated that she "felt uncomfortable," so she "nudged" Ms. Melton, who looked at them and then, according to Ms. Westman, shook and put her head down. When Ms. Westman heard B.R. say it again, she "turned around completely in [her] seat." She testified that she looked at him and "gave him a look, like what are you doing." Ms. Westman testified that she did not mention the incident to him on the van because she did not want "to get into a big scene."

In surrebuttal, the defendant called Ms. Melton, and she testified regarding the San Diego incident. Ms. Melton testified that the defendant touched B.R.'s face and arms in a "playful" manner; she described the interaction between the two as "child's play." She stated that B.R. would tell the defendant to stop and that B.R. "was being silly." Ms. Melton testified that there was nothing "sexual" about the actions.

*Schiefelbein I*, 230 S.W.3d at 97–111.

The TCCA provided the following summary of the two-day evidentiary hearing held in

September 2008 on Schiefelbein's post-conviction petition:

David Lewis Raybin testified that he was an attorney with thirty-four years of experience in Tennessee criminal law. He authored *Tennessee Criminal Practice and Procedure* (West 1984) and had previously testified as an expert on criminal defense representation. Mr. Raybin testified that he prepared the petitioner's motion for new trial and represented the petitioner at the hearing on the motion for new

trial and on appeal. Over the state's objection, the petitioner tendered Mr. Raybin as an expert on the standard of care for defense attorneys in Tennessee.

Mr. Raybin, in the course of his representation of the petitioner, discussed the trial with trial counsel. Because the state argued that trial counsel had waived issues Mr. Raybin felt were central to the petitioner's case, he wanted trial counsel to testify at the hearing on the motion for new trial about the allegedly waived issues; however, the trial court would not allow trial counsel's testimony. Mr. Raybin testified that the waivers prevented him from securing a new trial for the petitioner, even though he was successful on other issues presented on appeal.

Mr. Raybin opined that trial counsel's performance fell below the standard of care on several occasions. First, he said that trial counsel did not lay a proper foundation for Dr. Yabut to testify that B.R. would have had physical manifestations of the pain that she told Ms. Thompson she experienced, nor did he attempt to have B.R.'s medical record admitted as evidence. The defense theory was that, because she did not have any physical manifestations, B.R. was not truthful when she told Ms. Thompson that the petitioner had touched her; ergo, the petitioner was innocent. The state successfully objected as to the relevance of Dr. Yabut's medical testimony because the rape charges, which required proof of penetration, had been severed. Mr. Raybin said that if trial counsel had laid a proper foundation for Dr. Yabut's testimony and the medical record, then the state's relevance objection would have been meritless, and the jury would have heard evidence that B.R.'s statements were medically inconsistent. Mr. Raybin testified that he argued on appeal that Dr. Yabut's medical testimony should have been presented to the jury as substantive evidence of the petitioner's innocence, but he lost the argument because trial counsel had waived the issue by never articulating that Dr. Yabut's testimony was substantive evidence rather than merely for impeachment purposes.

Mr. Raybin testified that trial counsel knew of an audiotape recording of a conversation between B.R. and the petitioner because trial counsel received a transcript of the conversation during discovery. However, Mr. Raybin stated that trial counsel did not request a copy of the tape before trial. Mr. Raybin said that the first time either trial counsel or the petitioner heard the recording was when the state introduced it during Detective Breedlove's testimony on July 8. Mr. Raybin explained that the state thoroughly cross-examined the petitioner on July 11 about his inflection during the conversation. The petitioner was effectively impeached because, according to Mr. Raybin, trial counsel had not prepared him for cross-examination about the recording. The petitioner played the video of his cross-examination for the court, and Mr. Raybin opined that if the petitioner had been adequately prepared, then the state might not have impeached him. Mr. Raybin testified that trial counsel's failure to obtain a copy of the audiotaped conversation, to discuss the recording with the petitioner, and to prepare the petitioner for the state's cross-examination caused his representation to be below the standard of care. He further testified that there was no tactical reason for not obtaining a copy of the audiotape before trial. When asked whether there could be a tactical reason

for not objecting to admission of the audiotape, Mr. Raybin opined that one might ask for exclusion of the evidence on a discovery violation or ask for a continuance instead. He said that was not done in this case.

Mr. Raybin testified that the state questioned the petitioner about voice stress analysis, which he said was not permissible under the rules. Trial counsel unsuccessfully objected to the relevance of the line of questioning but did not move for a mistrial. When asked whether the questions about voice stress analysis prejudiced the petitioner, Mr. Raybin responded that voice stress analysis was analogous to lie detector tests, but trial counsel did not base his objection on the state's use of voice stress analysis as a lie detector.

According to Mr. Raybin, trial counsel did not view all of the videotapes that were evidence at trial. Mr. Raybin explained that the petitioner recorded the victim and other gymnasts, fully clothed, at the gym. Trial counsel requested copies of the tapes, but the state refused, arguing that the tapes were pornographic. Trial counsel requested a discovery violation and an interlocutory appeal, and the trial court denied both. Trial counsel then had to drive to Franklin from Nashville to view the tapes rather than have his own copies. Mr. Raybin said that trial counsel viewed approximately one-third of the tapes, and neither he nor the petitioner had seen them all until trial. He testified that there was no tactical reason for not viewing all of the videotapes but conceded that trial counsel objected to the videotapes in every possible way aside from seeking an extraordinary appeal or continuance. Mr. Raybin further testified that on the petitioner's direct appeal, another panel of this court held that, because trial counsel did not seek a continuance, he did not mitigate the harmful effect of the discovery violation.

Mr. Raybin next addressed the "spectator shift" issue. He explained that the court ordered the trial spectators to move when the state played the videotapes of the gymnasts so they would be unable to see the video. Mr. Raybin testified that he argued on appeal that the "spectator shift" signaled to the jury that "it's so horrible what the [petitioner] did that normal people can't even see it, that it rises to the level of child pornography." He also contended that it "emphasized that evidence to the extreme prejudice of the [petitioner]." Mr. Raybin said the shift occurred "at least half a dozen times." He maintained that the videotapes were the state's "only evidence against [the petitioner] that did not consist of the testimony of the child. It was a piece of ostensible physical evidence[;] therefore[,] it was a paramount evidentiary weight against him...." Mr. Raybin testified that a previous panel of this court deemed this argument waived by trial counsel because trial counsel failed to object and actually acquiesced to the court's order.

Mr. Raybin then testified that the state cross-examined the petitioner about the video tapes, asking whether the petitioner had seen all of the tapes. Mr. Raybin said the petitioner responded that he had not seen all of the tapes because the Brentwood Police Department had prevented him from doing so. Mr. Raybin testified that at that point in the petitioner's testimony, the trial court instructed the jury to disregard

the petitioner's statements. During the appeal, Mr. Raybin argued that the trial court's actions amounted to a comment on the evidence and were prejudicial to the petitioner because the trial court was in effect telling the jury that the petitioner was lying. Trial counsel did not object and agreed to striking the petitioner's statements. On appeal, a previous panel of this court deemed the issue waived because trial counsel had not preserved the issue by objecting. Mr. Raybin testified that criminal defense attorneys have an obligation to "clearly establish the record."

Mr. Raybin recalled that the trial court questioned four of the state's witnesses sua sponte, and trial counsel did not object to the questioning at any point. He said that the court asked the victim credibility questions. He opined that in general, when credibility is a central issue, questions about credibility signal to the jury that "the judge is either siding with or against a particular witness." However, Mr. Raybin acknowledged that "the law says that a judge has ample authority to [ask questions of witnesses] to clarify questions [by attorneys], to move testimony along, and where there's confusion." Mr. Raybin testified that this court deemed the issue waived because trial counsel did not object to the trial court's questioning of the victim.

Mr. Raybin recounted that the state called Lucy Fox during the trial and tendered her as an expert in the field of gymnastics. He testified that the trial court asked Ms. Fox "whether a gym instructor should obtain parental consent before video taping the participant[.]" Mr. Raybin did not recall whether the question was from the jurors and denied that it was a legitimate follow-up question or clarified previous testimony. Trial counsel did not object to the question. Mr. Raybin raised the issue on appeal, arguing that the question prejudiced the petitioner because he had not gained parental consent for the videos, but this court deemed the issue waived.

Mr. Raybin testified that the trial court asked the victim's mother whether the victim had shared "her story" with her friends. Trial counsel did not object, and subsequently, this court ruled that the issue was waived. Mr. Raybin further testified that the trial court questioned Phyllis Thompson, a clinical social worker, about how many times the victim mentioned pain in her report. Again, trial counsel did not object, and this court deemed the issue waived.

Mr. Raybin recalled that when the state referred to video footage of the victim, the state used the term "vaginal shots ... dozens" of times. He testified that the video footage never shows the victim's vagina, nor the vagina of any other female. Mr. Raybin said trial counsel never objected to the use of the term; trial counsel could have asked the trial court to order the state to use "some other non-prejudicial description[,]" but he did not do so.

Mr. Raybin admitted that this court deemed several of the issues he raised on appeal waived because he did not provide adequate citation to authority in his brief. He said "that was not a tactical decision on [his] part[;] it was oversight." Mr. Raybin testified that it is possible for individual errors by trial counsel to be insufficient to

merit a new trial, but the cumulative effect of the errors might coalesce to the point that a new trial is warranted. He also said that the issues brought up in the post-conviction hearing should not be considered previously determined because the issues were deemed waived and not fully heard on the appellate level.

On cross-examination, Mr. Raybin testified that while the medical report was not introduced by either party at trial, Ms. Thompson, the social worker, repeatedly referred to the report in her testimony. He agreed that trial counsel's strategy was to avoid calling Dr. Yabut unless a witness testified that the victim experienced pain, and trial counsel decided to call Dr. Yabut to rebut Ms. Thompson's testimony. Mr. Raybin said that the trial judge would not allow Dr. Yabut's testimony. He agreed that trial counsel made a proffer of proof, which this court reviewed along with the medical report. This court determined that Dr. Yabut's testimony was marginally relevant, and the trial court's error in disallowing the testimony was harmless. Mr. Raybin posited that if trial counsel had presented the testimony of the nurse who prepared the medical report, then Dr. Yabut's testimony would have been directly relevant in impeaching the state's expert, the nurse. Mr. Raybin agreed that the nurse stated in the medical report that the victim's examination "neither confirmed [n]or ruled out the possibility of any type of sexual contact." He further agreed that the trial court ruled that Dr. Yabut's testimony regarding pain was not relevant to the elements of aggravated sexual battery but allowed Dr. Yabut to testify about other things.

Mr. Raybin testified that trial counsel and the petitioner went to the Brentwood Police Department several times, but he did not know whether the audiotape of the conversation between the petitioner and the victim was stored at the police department. He agreed that the transcript of the conversation was accurate. Mr. Raybin testified that, at the time of trial, the discovery rules provided for inspection of evidence and allowed the defense to request a copy. He said that if the defense requested a copy, then the state was required to provide the copy. Mr. Raybin agreed that inspection can sometimes be sufficient. He testified that the petitioner had access to the transcript of the conversation and that he had discussed the conversation with trial counsel.

When asked about making objections as a general matter, Mr. Raybin testified that an attorney might not make an objection for tactical reasons, for example, so as not to draw attention to something. Whether foregoing an objection is reasonable "depends on the nature of the testimony or evidence that's being introduced." Mr. Raybin said that the standard of care requires an attorney to object if the evidence or testimony sought to be introduced is prejudicial to the client. The objection then preserves the issue for appeal and might result in the testimony or other evidence being excluded.

Mr. Raybin testified that a previous panel of this court reviewed some of the waived issues for plain error. For example, this court did not find plain error in the trial court's questioning of Ms. Fox, the state's gymnastics expert, because "a clear and

unequivocal rule of law [had] not been breached and because the [petitioner's] substantial rights [had] not been adversely affected." Mr. Raybin said that plain error review is "almost insurmountable," and he would have had a lower burden to meet if trial counsel had not waived the issues. He agreed that this court ruled that the judge's questions to Ms. Fox, the victim, and the victim's mother did not amount to comments on the evidence. Mr. Raybin agreed that Ms. Fox's reply to the trial court's question, that parental consent is not necessary if video taping is for legitimate purposes, could be interpreted as supportive of the defense theory that the petitioner had a legitimate purpose for taping the gymnasts.

Trial counsel testified that he had practiced law in Tennessee for twenty-eight years. The petitioner retained him prior to the indictment in this matter but after police had seized videotapes and computers from the petitioner's home and office. Trial counsel filed a motion for discovery of the items seized, and originally, the state agreed to copy the tapes for him. Later, however, the state refused to hand over the tapes, reasoning that the tapes were illegal, and therefore, they did not have to turn them over to the defense. Trial counsel moved the court to compel the state to copy the tapes, but the court denied the motion, instead allowing trial counsel to view the tapes at the Brentwood Police Department. Trial counsel testified that the court's ruling made it difficult for him to review all of the tapes. He reviewed six or seven of the tapes housed at the police department.

Trial counsel testified that he believed the trial court's denial of his motion to compel discovery was unlawful. He filed a Rule 9 application for an interlocutory appeal with the trial court, which the court denied. Trial counsel did not file a Rule 10 extraordinary appeal because he believed this court would not have compelled the state to provide copies because he had access to the tapes. He stated that he would have reviewed the twelve tapes in question if the state had provided copies of them. Trial counsel explained that, of the tapes he did review, he would write down each instance that the tape showed a gymnast's pelvic area. He stated that he did not discuss the tapes with the petitioner while at the police department because they "didn't feel comfortable talking about those tapes there at the police department." By the time of trial, trial counsel had not reviewed the twelve tapes at issue. He acknowledged that he could have asked for a continuance but did not.

Trial counsel agreed that, before the state played the videotapes for the jury, he brought the issue of the revictimization of the child to the court's attention. He did not know whether his statements in that regard prompted the court to order that spectators in the courtroom move so they could not see the videos. Trial counsel did not object to the shift, believing that if the public saw the videotapes, the petitioner's reputation as a gymnastics instructor would be damaged. Trial counsel said that, at that point, he believed that the jury would acquit the petitioner, and his decision not to object was based on his concern for the petitioner's business rather than his "strategy of guilt or innocence." He stated that the shift would not affect the jury but acknowledged that he did not consider what the jury would think about

the shift. Trial counsel denied that he suggested the spectator shift as "an attempt to ingratiate [himself] to the court."

Trial counsel recalled that the petitioner, during his testimony at trial, said that the court had imposed "strict rules" on him that made him unable to view all of the videotapes. Trial counsel said that the petitioner's statement was true because the trial court did place restrictions on their access to the tapes. He said that the appellate court had ruled that the trial court erred in placing those restrictions. Trial counsel recalled that the trial court instructed the jury to disregard the petitioner's testimony "concerning any alleged denial of access to tapes by the Brentwood Police Department prior to today...." Trial counsel did not object to the trial court's instructions. He could not remember whether he agreed with the trial court's instructions and said that if he did, he made a mistake in so agreeing. Trial counsel testified that he did not have a tactical reason for not objecting to the trial court's actions. While he could not recall this court's ruling on the matter, trial counsel stated that a trial attorney has a duty to preserve the record for appeal and failing to object constitutes waiver of an issue.

Trial counsel testified that in his opening statement, he told the jury that credibility would be a central issue in the case. He agreed that attacking the victim's credibility was part of his defense strategy, but he did not object when the trial court asked the victim whether she was telling the truth and whether anyone had coached her. Trial counsel said that he believed it was a proper line of questioning and stated that he would have asked the same questions. He recalled the judge asking another witness, Ms. Fox, whether the petitioner should have obtained parental consent for videotaping the gymnasts, and he stated that he believed her answer, that the petitioner did not need parental consent if the taping was for legitimate gymnastic purposes, was beneficial to the petitioner's case. Trial counsel agreed that he did not object to the trial court's questioning of the victim's mother, saying that he did not believe he had "the authority to tell a judge that he can not [sic] ask questions nor [did] he believe ... that the judge was commenting on the evidence one way or another." Trial counsel clarified that he had the authority to object if he felt the judge asked an inappropriate question, but he did not believe the judge asked any inappropriate questions in this matter. Trial counsel recalled that the judge asked Ms. Thompson, the social worker, about the victim's references to pain. Trial counsel said that he wanted her to testify about the victim's report of pain because his strategy was to bring out that pain was inconsistent with the medical findings. He planned to have Dr. Yabut testify in that regard, but the trial judge did not allow the doctor's testimony. Trial counsel agreed that he could have called the nurse who examined the victim for the same purpose, but he believed that Dr. Yabut was more qualified. Trial counsel testified that the medical report could have been admitted through the nurse's testimony, but he maintained that the information in the medical report was more important than the report itself.

Trial counsel could not recall the assistant district attorney general using the phrase "vaginal shots" in reference to up-close video footage of the victim and other

gymnasts. He testified that "if you take a video camera shot of the hip pelvic area[,] and the legs are spread apart[,] the vagina area is going to be visible." He never saw an unclothed vagina in the videos, however. Because he did not object to the use of the term "vaginal shots" during trial, trial counsel "guess[ed]" that he thought the term was "proper and fair" at the time. Trial counsel testified that he did not view the phrase as contrary to his defense theory that the videos were taken for legitimate gymnastic purposes.

Regarding the audio taped conversation between the petitioner and the victim, trial counsel said he never received a copy of the tape, despite making a discovery request. He did not include the audiotape in his motion to compel the state to turn over copies of the videotapes because he believed that the state was going to give him a copy of the audiotape without being compelled to do so. Trial counsel testified that he believed he listened to the audiotape prior to trial, in order to compare it to the transcript of the conversation, but he had no recollection of exactly when and where he listened to it. Trial counsel knew that the petitioner had not heard the audiotape prior to trial, and the petitioner was always with him when he went to the Brentwood Police Department to view the videotapes. He said that he might have heard the tape somewhere other than the police department. He did not object to the state's playing the tape during trial.

Trial counsel could not recall the state's cross-examination of the petitioner about the taped conversation. He acknowledged that it would have been proper for him to prepare the petitioner for cross-examination by listening to the tape together, but that did not occur. Trial counsel agreed that the petitioner could not have known what his voice inflection was during the conversation by reading the transcript. He recalled that the state played a portion of the audiotape during the cross-examination, which he did not do in his direct examination. Trial counsel further recalled that the state questioned the petitioner about voice stress analysis and compared it to a lie detector test. He testified that evidence about lie detector tests is inadmissible in criminal trials. He did not object to the questions about voice stress analysis nor did he move for a mistrial.

Trial counsel testified that, on each day of trial, he requested and received a video copy of that day's testimony. Counsel met with the petitioner each day after trial at counsel's home, and he reviewed the videotaped testimony after the petitioner left every night.

On cross-examination, trial counsel explained that his theory for the petitioner's defense was to question the victim's motivation for making the accusations against him. He said that the victim's mother pressured her into gymnastics, and she had tried to quit before. Trial counsel's theory was that the victim used the accusations against the petitioner as a way to quit without her mother being angry. Trial counsel testified that he developed his theory by questioning both the victim and her mother. He played a video of the victim's interview with the police for the jury to support his theory that the victim had been coached. He also cross-examined the victim and

her mother about the victim's inconsistent statements. Trial counsel tried to show the jury that the gym and office layout would have meant that people were always within view when the petitioner allegedly touched the victim. He used videotapes to show the layout of the gym, introduced pictures of the office, and brought in the mat that the victim said hid them from view. Trial counsel developed his theory that the petitioner's videotapes were for legitimate gymnastic purposes by cross-examining Ms. Fox with gymnastics magazines and treatises.

Trial counsel filed numerous pretrial motions in this matter. He successfully argued that a video of the petitioner in a bathroom should be excluded from the state's case-in-chief and that a prior conviction was stale, but he was not successful in getting one of the indictment counts dismissed or having the videos of the gymnasts excluded.

Trial counsel testified that he asked the petitioner whether the videos they had not watched were different than those they had watched. The petitioner replied that they were basically the same thing. Trial counsel said that he did not see anything at trial that was different from what he had viewed before trial. He did not believe he would have been successful if he had filed for a continuance to view the remaining videotapes. Trial counsel testified that he would not have stopped watching the videotapes if he had believed there was anything different on the remaining tapes. Trial counsel explained that he did not want the public to see the videotapes out of context. He was concerned about the possibility because of the media coverage of the trial. He did not consider whether the spectator shift would draw undue emphasis to the videotapes. Trial counsel testified that, in hindsight, he should have objected to the trial court's sua sponte impeachment of the petitioner. When the trial court brought up its protective order that limited the petitioner's ability to view the videotapes, trial counsel stated for the record that he was not waiving his objection to the protective order by agreeing to the trial court's striking of the petitioner's testimony.

Trial counsel testified that, early in the proceedings, he came to the conclusion that the petitioner was not receiving a fair trial from the trial judge. The trial judge severed the rape charges on the first day of trial, and the severance meant that he could not use the only physical evidence in the case. Trial counsel said that, after the severance, he still believed that the petitioner could get a fair trial, until the trial judge allowed the state to introduce the bathroom tape of the petitioner through the "back door." Once the bathroom tape was in, trial counsel believed that the petitioner's "fate was sealed because that should never have been allowed." Trial counsel said that he complained to the media about the trial judge, which led to the trial judge filing a complaint against him.

Trial counsel testified that he met with the petitioner fifteen to twenty times prior to trial. He developed a list of questions that he would ask the petitioner on direct examination; he also tried to anticipate what the state would ask on cross-examination. Trial counsel went through the list of questions with the petitioner and

gave the petitioner a printout of the questions. After the state played the audiotaped conversation between the petitioner and the victim at trial, trial counsel and the petitioner discussed the circumstances around the conversation. Trial counsel said that the petitioner was in court when the state played the audiotape for the jury. Trial counsel testified that, at the time of trial, he felt that he had adequately prepared the petitioner for his testimony both on direct and cross-examination. Trial counsel said that the petitioner was "combative," so he tried to advise the petitioner to be less intense.

Trial counsel testified that, in hindsight, he should have objected to the state's voice stress analysis questions on a basis other than relevancy. He agreed that the appellate court ruled that the improper cross-examination was not reversible error because "the improper cross-examination neither affirmatively appear[ed] to have affected the result of the trial on the merits nor involve[d] a substantial right of the [petitioner]."

On redirect examination, trial counsel agreed that the appellate court had concluded that there was no plain error in the trial court's questioning of the victim because the record did not clearly establish what happened at trial, specifically at a bench conference held prior to the victim's testimony.

David August Boto testified that he is currently general trial counsel for the Executive Committee of the Southern Baptist Convention. Before coming to Nashville, he was administrative trial counsel to the Texas District County Attorneys Association and an elected prosecutor in Texas. He testified that he is familiar with the jury trial system. Mr. Boto was present at the petitioner's trial originally because his son was subpoenaed to testify, but he continued attending because he was interested in the proceedings. He recalled that members of the public were asked to move to an area of the courtroom where they could not see a screen, and the jury was present when the spectators moved. Mr. Boto testified that his immediate response to the spectator shift was "that it portended that the content of the film would be some sort of smoking gun; that there would be some ... licentious sort of content." He said that he had never seen a similar shift before.

On cross-examination, Mr. Boto testified that his son, Matt Boto, had been subpoenaed to testify by the petitioner, but trial counsel did not call him to the stand. Matt was friends with the petitioner through his involvement in gymnastics. Mr. Boto said that he was not present for the entire trial. He had personally known the petitioner for less than five years at the time of trial. Mr. Boto contributed monetarily to the petitioner's defense after the trial was over.

The petitioner tendered Dr. Edmond Yabut as an expert in emergency medicine and pediatrics. Dr. Yabut testified that presence of pain is an objective symptom, while the degree of pain is subjective. He said that a patient reporting pain would generally exhibit "corresponding medical evidence." Dr. Yabut identified the victim's medical report from Our Kids Center and testified that the victim reported

pain when the petitioner touched her, but her physical examination did not reveal evidence of injury. Specifically, Dr. Yabut testified that the exam showed that the victim's hymen was intact with no sign of damage. He said that he would expect a young victim, who reported months of painful sexual assault, to exhibit signs of trauma around the hymen, specifically "furrowing ... tears or clefts around the edges." He said that a young girl could receive hymenal injuries that were not associated with sexual assault, for example, from bicycle injuries. The victim's medical report reflected a normal medical exam. Dr. Yabut opined that a normal medical exam would not "be consistent with a young patient's claim that she's been painfully sexually assaulted [twenty] to [thirty] times." He further opined that the victim was not "painfully sexually assaulted over a period ... of several months."

On cross-examination, Dr. Yabut testified that his daughter took gymnastics lessons from the petitioner, and he contributed both towards the petitioner's bond and lawyer fees. Dr. Yabut testified that fondling the labia without entering the vaginal vault should not cause injury or pain. He said that he did not know that penetration in the legal sense included penetrating the labia. Dr. Yabut agreed that the victim reported that "it hurt a little when [the petitioner's] fingers touched her private spot...." She also reported that she was unsure whether or not his fingers went inside her body, and she did not say how much force was used. Dr. Yabut agreed that the child could have experienced pain if force was used without having resultant injuries. He further agreed that the report did not mention repeated painful penetration.

Following the hearing, the post-conviction court rendered a memorandum opinion on October 20, 2008, denying post-conviction relief. The court found trial counsel deficient in five areas: (1) failing to object to the "spectator shift"; (2) failing to object to the trial court's impeachment of the petitioner; (3) failing to object to the trial court's bolstering the credibility of the victim and her mother; (4) failing to prepare the petitioner for cross-examination regarding the audiotaped conversation and failing to listen to the tape before trial; and (5) failure to move for a mistrial after the trial court allowed the state to question the petitioner about voice stress analysis. The court found that trial counsel had tactical reasons for not objecting to the trial court's questioning of Ms. Fox and Ms. Thompson and to the state's use of the term "vaginal shots." The court further found that Dr. Yabut's testimony would not have amounted to substantive evidence of the petitioner's innocence, and therefore, trial counsel was not deficient in failing to provide a proper foundation for his testimony. The post-conviction court, however, determined that the petitioner did not carry his burden of showing that trial counsel's deficient representation prejudiced the defense. The court stated that the victim's testimony was "extremely powerful," while the petitioner's testimony was evasive and did not explain the videotapes or audiotape.

*Schiefelbein II*, 2010 WL 1998744, at *15–24.

### III.    Issues Presented for Review

Schiefelbein's amended petition argues that his trial counsel was ineffective because he:

1) "fail[ed] to object to questioning by the State and the Trial Court" (Doc. No. 39, PageID# 6788);

2) "failed to object to the trial court's improper striking of his truthful testimony, failed to request a mistrial, and actively condoned this act by the court" (*id.*);

3) "failed to object to the trial judge's bolstering questions of 'B.R.'" (*id.*);

4) "failed to object to the trial judge's questioning of 'B.R.'s' mother, and the elicitation of a prior consistent statement by 'B.R.'" (*id.* at PageID# 6789);

5) "failed to request a mistrial in response to the 'Voice Stress Questioning' of Mr. Schiefelbein" (*id.*);

6) "fail[ed] to object to the terms 'vagina,' 'vaginal area[,]' and 'vaginal shots,' which were used by the prosecution to refer to the general lower torso, hips and pelvic region of fully clothed gymnasts, as well as videotapes of those regions on such fully clothed gymnasts" (*id.*);

7) "fail[ed] to object to the 'spectator shift,' which denied Mr. Schiefelbein a public trial," and instead "actively promot[ed] [it]" (*id.*); and,

8) "fail[ed] to obtain an audiotape of Mr. Schiefelbein speaking with 'B.R.,'" "object to the use of this audiotape at trial," and "prepare Mr. Schiefelbein to be cross-examined in relation to this audiotape." (*Id.* at PageID# 6790.)

Schiefelbein argues that the totality of these errors constitutes further ineffective assistance of counsel (*Id.*) Schiefelbein also claims that his right to a public trial was violated when the trial

court, "at the suggestion of trial counsel, prohibited the public from seeing videotapes that were played for the jury." (*Id.* at PageID# 6793–94.)

## IV.     Legal Standard

Schiefelbein's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. AEDPA "dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citations and quotations omitted); *see also Hardy v. Cross*, 565 U.S. 65, 66 (2011); *Felkner v. Jackson*, 562 U.S. 594, 597 (2011). AEDPA "requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006) (quoting *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998)).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see also Burt v. Titlow*, 571 U.S. 12, 16 (2013); *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The statute enforces the principle that "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 563 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)) (Stevens, J., concurring); *see also Woods v. Donald*, 125 S. Ct. 1372, 1376 (2015). AEDPA prevents federal "retrials" of matters decided by the state court and "ensure[s] that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (*Bell I*). Under its provisions, petitioners may not "us[e] federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 567 U.S. 37, 38 (2012); *see also White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (explaining that the Supreme

Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court'") (quoting *Burt*, 571 U.S. at 16).

The statute provides for the review of state court decisions in § 2254(d), which states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In determining the content of "clearly established Federal law" under § 2254(d)(1), this Court may not rely on the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014); *Harris v. Stovall*, 212 F.3d 940, 943–44 (6th Cir. 2000). Only the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision" are "clearly established" law for the purpose of the AEDPA analysis. *Williams*, 529 U.S. at 412; *Greene v. Fisher*, 565 U.S. 34, 38 (2011); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Thus, the inquiry into the nature of "clearly established Federal law" is limited to an examination of the landscape of Supreme Court holdings as it would have appeared to the Tennessee state courts at the time that they adjudicated the petitioner's case on the merits. *Miller v. Stovall*, 742 F.3d 642, 644–45 (6th Cir. 2014) (citing *Green*, 565 U.S. at 38).

A federal habeas court may issue the writ under AEDPA's "contrary to" clause if the state court applies a rule different from the governing law set forth in United States Supreme Court

decisions or if it decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. *Bell I*, 535 U.S. at 694 (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)).The Court may grant relief under the "unreasonable application" clause "if the state court identifies the correct governing legal rule from [United States Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. A federal habeas court may not find a state court adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411; *accord Bell I*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S. Ct. 1697, 1706–07 (2014) (quoting *Harrington*, 562 U.S. at 103). Finally, habeas relief is available under § 2254(d)(2) if the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented." However, "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing' evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199–2200 (2015) (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)); 28 U.S.C. § 2254(e)(1).

AEDPA also imposes a total exhaustion requirement, contained in 28 U.S.C. § 2254(b) and (c), which directs that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State" or such remedies are no longer available. *Rhines v. Weber*, 544 U.S. 269, 274 (2005). With certain limited exceptions, to properly exhaust a claim under AEDPA, the petitioner must have raised the

same claim on the same grounds before the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417) (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). "Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Lyons v. Stovall*, 188 F.3d 327, 331 (6th Cir. 1999). In Tennessee courts, a petitioner has exhausted all available state remedies when the TCCA has denied a claim of error. *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003) (citing Tenn. Sup. Ct. R. 39).

"[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thomas*, 501 U.S. 722, 732 (1991). If the claims can no longer be considered by the state court because they are procedurally barred under state law, they are considered defaulted for purposes of federal review. A petitioner must "demonstrate cause for his state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

## V.    Analysis

Schiefelbein argues that the TCCA's resolution of his ineffective assistance of counsel and right to a public trial claims "was contrary to, and an unreasonable application of, clearly established federal law, or was an unreasonable determination of facts in light of the evidence presented." (Doc. No. 39, PageID# 6791, 6795.) The Court finds no merit in Schiefelbein's

arguments. The state courts properly applied the law governing ineffective assistance of counsel claims and their rulings were reasonable when viewed in AEDPA's deferential light. Further, Schiefelbein has procedurally defaulted his right to a public trial claim.

### A.  Ineffective Assistance of Counsel

*Strickland v. Washington*, 466 U.S. 668 (1984), sets a two-part test to evaluate whether counsel has been constitutionally ineffective. A petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that, but for counsel's deficient representation, "the result of the proceeding would have been different." *Strickland*, 66 U.S. at 688–89, 694. The *Strickland* standard itself sets a high bar that is not easily surmounted by habeas petitioners. *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (alteration in original) (quoting *Strickland*, 466 U.S. at 690).

"The Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA; it requires the petitioner not only to demonstrate the merit of his underlying *Strickland* claim, but also to demonstrate that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Jackson v. Houk*, 687 F.3d 723, 740 (6th Cir. 2012) (citing *Harrington*, 562 U.S. at 102). Where a state court correctly identifies *Strickland* as the controlling precedent and applies it in evaluating a petitioner's claims, this Court applies a doubly deferential standard in its review. *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 848 (6th Cir. 2017). The Court asks "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" and, if so, must deny relief. *Id.* (quoting *Harrington*, 562 U.S. at 89). "The pivotal

question," therefore, is not whether this Court would find counsel's performance deficient, but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101.

Even where counsel's performance was found constitutionally unreasonable, the petitioner is not entitled to relief if counsel's error had no prejudicial effect. *Strickland*, 466 U.S. at 691. To establish the necessary prejudice, the petitioner must prove that, absent counsel's deficient performance, there is a "reasonable probability" that the result of the trial would have been different. *Id.* at 694. A court need not analyze both *Strickland* elements if the defendant makes an insufficient showing on one—"[i]n particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of one of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

Schiefelbein acknowledges "that to prevail on this petition for relief, he must be able to show that the Tennessee courts' repeated denials of relief were contrary to, or involved an unreasonable application of, clearly established Federal law, or were based on an unreasonable determination of facts in light of the evidence presented." (Doc. No. 39, PageID# 6764.) Yet his argument in support of his ineffective assistance claims makes scant reference to his burden under AEDPA and instead focuses on reiterating the merits of the claims. (Doc. No. 39, PageID# 6787–92.) Schiefelbein has not shown that he is entitled to relief under AEDPA.

### 1. The TCCA's rejection of Schiefelbein's ineffective assistance of counsel claims was not contrary to clearly established law.

Before analyzing Schiefelbein's claims of ineffective assistance, the TCCA properly identified *Strickland* as providing the controlling standard. *See Schiefelbein II*, 2010 WL 1998744, at *25. Schiefelbein concedes that *Strickland* is clearly established law that governs ineffective assistance of counsel claims. His first attack on the TCCA's opinion focuses on how the TCCA

rejected the ineffective assistance claim based on trial counsel's failure to object to the court's decision regarding who could view the videotapes. (Doc. No. 39, PageID# 6786, 6791.) The TCCA's held as follows:

> At the post-conviction hearing, trial counsel testified that, at the time the videotapes were introduced, he believed the petitioner would be acquitted. He was concerned with the impact that the videotapes would have on the petitioner's business interests if the media showed the tapes out of context, so he made the decision not to object to the gallery shift. In our view, trial counsel made a reasonable, professional decision at that time. Further, a fair assessment of trial counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of trial counsel's challenged conduct, and to evaluate the conduct from trial counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The petitioner's argument on this issue is without merit.

*Schiefelbein II*, 2010 WL 1998744, at *26.

Schiefelbein argues that the TCCA's rejection of this claim was contrary to clearly established law because the spectator shift was tantamount to a closure of his trial and "any waiver of a defendant's right to a public trial MUST be analyzed pursuant [to] *Waller v. Georgia* . . . ." (Doc. No. 39, PageID# 6791) (emphasis in original). In *Waller*, the Supreme Court held that, to justify the closure of a public hearing, "the party seeking [closure] must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller v. Georgia*, 467 U.S. 39, 48 (1984). Schiefelbein claims that, because the TCCA did not examine trial counsel's performance in light of *Waller*, its decision was contrary to clearly established law. (Doc. No. 39, PageID# 6792.)

*Waller* did not involve an ineffective assistance of counsel claim. *See Waller*, 467 U.S. at 40–41 (explaining that the issue before the Court was "the extent to which a hearing on a motion to suppress evidence may be closed to the public over the objection of the defendant consistently with the Sixth and Fourteenth Amendment right to a public trial"). However, Schiefelbein directs

the Court to the Sixth Circuit's opinion in *Johnson v. Sherry*, which "provides the intellectual framework for examining § 2254 requests for relief based on a State court's denial of the right to public trial, where the defense attorney does not object." (Doc. No. 39, PageID# 6793–94 (citing *Johnson v. Sherry*, 586 F.3d 439 (2009)).) In *Sherry*, the court held that "defense counsel's failure to object to the closure of [defendant's] trial may have fallen below an 'objective standard of reasonableness' as required in *Strickland*," but that it was impossible to make that determination, given the absence of district court findings on the question of whether the closure was constitutional under *Waller*. *Sherry*, 586 F.3d at 445. Consequently, the court remanded the case to the district court to determine whether the trial court closure was justifiable. *Id.* at 448. Schiefelbein argues that *Sherry* establishes a rule that, in order to determine whether a defense lawyer was deficient for failing to object to a court closure, courts must first determine the constitutionality of the closure using *Waller*. (Doc. No. 39, PageID# 6791–94.)

Assuming without deciding that *Sherry* establishes such a rule, the TCCA's failure to apply it was not contrary to clearly established law. First and foremost, a Sixth Circuit holding is not "clearly established" law for the purpose of AEDPA analysis. *Williams*, 529 U.S. at 412. But even if it were, Schiefelbein's case is distinguishable from *Sherry* in that the spectator shift is not an unambiguous "closure" of the court that would clearly require a *Waller*-guided analysis of trial counsel's conduct. *See Drummond v. Houk*, 797 F.3d 400, 402 (6th Cir. 2015) (finding "not obvious" and therefore "not clearly established for purposes of the habeas statute . . . whether and how [*Waller*'s] more specific rules apply in cases, like this one, where some spectators but not all are removed from the courtroom"). When confronted with Schiefelbein's right to a public trial claim on direct appeal, the TCCA held that it had been waived, but noted that Schiefelbein had cited no authority to support the conclusion that the spectator shift constituted a complete or even

a partial closure of the trial. *Schiefelbein I*, 230 S.W.3d at *116. The absence of a *Waller* analysis in the TCCA's post-conviction opinion does not render it contrary to clearly established law.

Schiefelbein also argues that, because the TCCA "only found one area of deficiency"— trial counsel's failure to obtain the audiotape of Schiefelbein's phone conversation with the victim or to mitigate the state's related discovery violation—it "never weighed or considered the 'overall' prejudice of all of trial counsel's deficiencies and errors 'in light of all the circumstances' as is required by Supreme Court precedent," and therefore issued a decision that was contrary to clearly established law. (Doc. No. 39, PageID# 6792 (citing *Strickland*, 466 U.S. at 690)) (emphasis in original). The TCCA responded as follows to Schiefelbein's cumulative error argument:

> The petitioner lastly argues that he received the ineffective assistance of counsel based on cumulative error. In light of our previous determinations, this issue is without merit.

*Schiefelbein II*, 2010 WL 1998744, at *31.

No Supreme Court decision supports the proposition that a court must aggregate the prejudice associated with trial counsel's conduct *not* found to be deficient; in fact, the language of *Strickland* cited by the TCCA suggests the opposite. *Schiefelbein II*, 2010 WL 1998744, at *25 ("Prejudice is shown if, but for trial counsel's unprofessional *errors*, there is a reasonable probability that the outcome of the proceeding would have been different" (emphasis added) (citing *Strickland*, 466 U.S. at 694); *see also United States v. Arny*, 831 F.3d 725, 734 (6th Cir. 2016) (explaining that, "[w]hen counsel's representation is deficient in several respects," the court "does not measure the result of each individual error, but 'consider[s] the errors of counsel in total, against the totality of the evidence in the case'") (quoting *Stewart v. Wolfenbarger*, 468 F.3d 338, 361 (6th Cir. 2006)); *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (rejecting petitioner's cumulative error argument in the context of an ineffective assistance of counsel claim because

there was not "more than one error to consider cumulatively"). Because the TCCA only found one instance of deficient performance, there were not multiple errors for it to accumulate. The TCCA's rejection of Schiefelbein's cumulative error claim was not contrary to clearly established law.

2. **The TCCA's rejection of Schiefelbein's ineffective assistance of counsel claims was not an unreasonable application of clearly established law, nor was it based on an unreasonable determination of fact.**

In his amended petition, Schiefelbein conflates these grounds for relief. He points out that the post-conviction trial court found that trial counsel's performance was deficient in several respects and asserts that the TCCA's determination that trial counsel was not deficient in those ways "was a completely unreasonable determination of fact." (Doc. No. 39, PageID# 6791.) Schiefelbein argues that the post-conviction trial court's finding that trial counsel was deficient in "multiple areas" was a factual finding entitled, under Tennessee law, to a presumption of correctness that the TCCA failed to honor. (Doc. No. 39, PageID# 6791.) However, in the context of an AEDPA review, the Court is not concerned with whether the TCCA properly applied Tennessee law and, under federal law, "a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)." Instead, "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland*, 466 U.S. at 698. Regardless of whether Schiefelbein's amended petition is construed as asserting that the TCCA's rejection of his ineffective assistance claims was an unreasonable application of *Strickland* or that it was based on an unreasonable determination of the facts, he is not entitled to relief.

a. **Recording of the phone conversation**

Schiefelbein brings several claims related to a recording of a phone conversation between him and B.R. The prosecution played this audiotape for the jury at trial, and Schiefelbein alleges

that trial counsel was ineffective for failing to obtain this audiotape before trial, object to its use at trial, or prepare Schiefelbein for cross-examination about it. (Doc. No. 39, PageID# 6790.)  The TCCA found that trial counsel's performance was deficient, but that Schiefelbein was not prejudiced:

> Trial counsel testified at the post-conviction hearing that he requested a copy of the audiotape and was under the impression that he would receive a copy before the trial began. Trial counsel's testimony was inconsistent about whether he heard the tape before trial or heard it for the first time at trial. The post-conviction court found that he did not hear it until trial, and the record does not preponderate against that finding. Trial counsel did not take any action to ameliorate the state's failure to comply with the discovery request. Because the audiotape was a key piece of evidence against the petitioner, trial counsel's failure to obtain a copy or mitigate the state's discovery violation constitutes deficient performance.

> The petitioner, however, has not carried his burden of showing prejudice. As this court has previously said,

>> the customary need for a copy of the audio cassette recording is to permit a comparison with the transcript that the [s]tate intends to offer at trial. In that fashion, any transcription inaccuracies or disputes can be resolved pretrial. In the present case, the defense does not point to any such inaccuracies with the [s]tate's furnished transcript or other specific prejudice warranting relief on appeal.

> *Schiefelbein*, 230 S.W.3d at 113. As for the state's cross-examination about voice inflection, the petitioner had the opportunity to hear the audiotape during Detective Breedlove's testimony, several days prior to his own testimony, and the petitioner had a "combative" nature that did him no favors when subjected to a rigorous cross-examination. More importantly, the jury heard the tape and came to its own conclusions as to the credibility of the petitioner. We conclude that trial counsel's deficient performance regarding the audiotape did not render the outcome of the proceedings unreliable; therefore, the petitioner is not entitled to relief on this issue.

> *Schiefelbein II*, 2010 WL 1998744, at *27.

The TCCA reasonably found that, although trial counsel should have presented the audiotape to Schiefelbein prior to trial and prepared him for cross-examination about it, counsel's failure to do so did not prejudice Schiefelbein. In his amended petition, Schiefelbein does not

explain how trial counsel's deficient performance with respect to the audiotape prejudiced him,[16]

and the only such argument that Schiefelbein presented to the TCCA was that counsel's deficient

performance allowed the "state [to] effectively impeach[] him on cross-examination." *Id.* at *27.

Yet, as the TCCA noted, Schiefelbein heard the recording three days prior to his testimony, giving

him time to prepare for questioning and mitigating the prejudice associated with counsel's failure

to obtain the tape earlier. (*See* Doc. No. 29-8, PageID# 3876–77; Doc. No. 29-11, PageID# 4663–

691.) The trial transcript also bears out the TCCA's characterization of Schiefelbein as

combative,[17] as the following excerpt from his cross-examination illustrates:

> Q. So would you agree or disagree that the inflection in your voice is inquiring about the second thing that [B.R.] is concerned about if she comes back to gymnastics?
>
> A. I disagree with the fact that you're implying as to the inflection of a voice on a conversation 10 months ago. I disagree with that.
>
> Q. Now then, again, we get to the videotapes, and you say there is no videotapes.
>
> A. Uh-huh.
>
> (Audiotape played.)
>
> Q. So did you know what videotapes [B.R.] was referring to?
>
> A. I'm not sure of the question that you're asking me.

---

[16] "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) (citation omitted). Because Schiefelbein has the burden to show prejudice, *Strickland*, 466 U.S. at 696, and he has made no specific argument as to why the failure to object prejudiced him, this claim fails.

[17] As Schiefelbein emphasizes, the post-conviction trial court read the transcript of Schiefelbein's cross-examination differently. (Doc. No. 39, PageID# 6790.) Rather than concluding, as the TCCA did, that Schiefelbein was "combative," that court characterized him as "unprepared" and used that to bolster its conclusion that trial counsel's performance was deficient. (*Id.*) The TCCA's characterization of the transcript is plausible, and therefore its rejection of this claim is not based on an unreasonable determination of fact.

> Q. When B.R. said, "And I'm worried about one more thing," and you say, "what," and she says, "the videotapes," you say, "There is no videotapes," did you know what videotapes she was asking about?
>
> A. That question would be too hard as a yes or no question to answer.
>
> Q. Well, either you knew what she was talking about or you didn't.
>
> A. It doesn't matter what she was talking about. It doesn't matter what tapes she was talking about. There would be no need to talk about any tapes.
>
> Q. Why would there be no need to talk about any tapes?
>
> A. Why would she be talking about any kind of tapes?

(Doc. No. 29-11, PageID# 4686–87.)

Trial counsel apparently anticipated that Schiefelbein's testimony might be perceived as combative and attempted to mitigate that effect:

> One of the things about [Schiefelbein] is that [he] is very intense and . . . when [he] takes on something, he takes it on wholeheartedly; he believes in it. And part of . . . my preparation was in prepping him, Mark can be combative and I knew that when he clashed heads with [the prosecution] at trial that . . . he wouldn't give an inch on anything, and that's just Mark's nature and I understood that. And it was one of the things I tried to prep him for was not to be combative and intense . . . .

(Doc. No. 20-5, PageID# 2692–93.) This testimony from trial counsel detracts somewhat from Schiefelbein's argument that additional preparation with trial counsel would have improved his testimony. Finally, the TCCA reasonably found that, regardless of Schiefelbein's performance and preparation, the jury heard the recorded conversation twice and reached its own conclusions. *Schiefelbein II*, 2010 WL 1998744, at *27. Neither the TCCA's application of *Strickland* nor its factual findings with respect to prejudice were unreasonable. Schiefelbein's claims related to the audiotape therefore lack merit.

**b. Language used for gymnasts' lower torso, hips, and pelvic region**

Schiefelbein asserts that trial counsel was ineffective for failing to object to the prosecution's use of the terms "vagina," "vaginal area," and "vaginal shots" to describe "the general lower torso, hips and pelvic region of fully clothed gymnasts, as well as videotapes of those regions on such fully clothed gymnasts." (Doc. No. 39, PageID# 6789.) Schiefelbein argues that these terms were inaccurate because the vagina is an internal organ and that their use amounted to "repeatedly calling the videos 'child pornography.'" *Id.* The TCCA rejected this claim:

> The petitioner contends that trial counsel provided ineffective assistance by not objecting to the state's repeated use of the term "vaginal shots" in reference to the close-up shots of the victim in the videotapes. The state responds that trial counsel made a tactical decision not to object. We agree with the state. At the post-conviction hearing, trial counsel testified that he believed the term was "proper and fair." Trial counsel stated that he did not believe the term went against the defense theory that the petitioner made the videotapes for legitimate training purposes. Trial counsel's testimony evinced that he made a tactical decision. We conclude, therefore, that trial counsel's performance was not deficient in this regard. The petitioner is not entitled to relief on this issue.

*Schiefelbein II*, 2010 WL 1998744, at *31

The TCCA's holding on this claim was reasonable. At the post-conviction hearing, trial counsel testified as follows:

> When the camera zoomed in on the waist area down, whenever you show the hip pelvic area you're going to show the vagina area also. If you're indicating that the vagina area without any clothes on no, but if you take a video camera shot of the hip pelvic area and the legs are spread apart the vagina area is going to be visible.

(Doc. No. 20-4, PageID# 2563.) In other words, trial counsel found the prosecution's characterization of the close-up shots reasonable and therefore made a strategic decision not to object to it. "Courts should not second-guess counsel's strategic decisions, and should presume that counsel's conduct is reasonable." *Morris v. Carpenter*, 802 F.3d 825, 843 (6th Cir. 2015). The

TCCA's decision to deny Schiefelbein's claim was neither an unreasonable application of *Strickland* nor based an unreasonable determination of fact.

### c. Voice stress analysis

Schiefelbein next asserts that trial counsel was ineffective for failing to request a mistrial in response to prosecution questions to Schiefelbein about voice stress analysis. (Doc. No. 39, PageID# 6789.) Although trial counsel objected to this questioning, he did not request a mistrial because of it. (Doc. No. 29-11, PageID# 4689–90.) The TCCA rejected this claim on the ground that Schiefelbein was not prejudiced:

> The petitioner contends that trial counsel provided ineffective assistance by not successfully objecting to or moving for a mistrial when the state questioned the petitioner about voice stress analysis. The state responds that trial counsel's performance was professionally reasonable and that trial counsel made a tactical decision to not move for a mistrial after his objection was overruled.
>
> The record shows that the state asked the petitioner whether he was familiar with voice stress analysis and if he was "aware that people can take a recording like this and determine whether or not someone is under stress, similar to that of a lie detector?" *Schiefelbein*, 230 S.W.3d at 133. Trial counsel objected on relevance grounds, and the trial court overruled the objection. *Id*. In the direct appeal on this matter, this court stated that "the [s]tate's cross-examination was misleading, factually incorrect, and irrelevant; it should not have been allowed." *Id*. at 134. However, this court did not find reversible error, stating that the cross-examination did not affect the outcome of the trial. *Id*. Whether or not trial counsel's performance was deficient, we conclude that the petitioner has failed to show how any error by trial counsel resulted in prejudice to the defense because, as this court previously found, the outcome of the proceeding was not affected by the improper questioning. The petitioner is therefore not entitled to relief on this issue.

*Schiefelbein II*, 2010 WL 1998744, at *28.

Schiefelbein argues that the TCCA was wrong not to adopt the post-conviction trial court's finding that trial counsel's failure to request a mistrial constituted ineffective assistance. (Doc. No. 39, PageID# 6778.) Schiefelbein also claims that "the [post-conviction trial court's] finding that a mistrial should have been requested is an implicit finding that the court believed that such a request

should have been granted, and thus, the failure to request [a mistrial] was prejudicial." (*Id.* at PageID# 6789.)

Schiefelbein's arguments are fruitless. *Strickland* makes clear that courts may dispose of an ineffective assistance claim on either component of the inquiry and, therefore, the TCCA's decision to analyze prejudice rather than deficient performance was not unreasonable. *Strickland*, 466 U.S. at 697. Even if the TCCA had found trial counsel deficient for failing to request a mistrial, that finding would not have been enough to imply prejudice—if Schiefelbein's contrary argument were accepted, and one could infer prejudice from a finding of deficiency, the need for the prejudice component of the ineffective assistance inquiry would disappear entirely. Finally, Schiefelbein's suggestion that a finding of prejudice was implicit in the post-conviction trial court's finding that trial counsel was ineffective is not well taken in light of that court's explicit finding that, despite all of trial counsel's errors, Schiefelbein was not prejudiced. (*See* Doc. No. 1-1, PageID# 105–06.) Given the evidence against Schiefelbein, as discussed in greater depth below, he has not shown that the TCCA's prejudice analysis was unreasonable, and his ineffectiveness claim with respect to the voice analysis questions is therefore without merit.

### d. "Spectator shift"

When the prosecution played videos of B.R. and other gymnasts for the jury, the trial court required all other spectators to move to one side of the gallery so that they would not see the videos. (Doc. No. 29-8, PageID# 3937–38.) Schiefelbein argues that "[t]rial counsel was ineffective for not only failing to object to the 'spectator shift,' which denied Mr. Schiefelbein a public trial, but by actively promoting such a prejudicial arrangement." (Doc. No. 39, PageID# 6789.) With respect to prejudice, Schiefelbein asserts that trial counsel's failure to object to this arrangement "coupled with the failure to object to the various 'vaginal' terms, worked to perpetrate a suggestion that the

'corroborating' videos were some form of powerful and devastating evidence, that a normal person could not bear to view." (*Id.*) The TCCA provided the following analysis of this claim:

> At the post-conviction hearing, trial counsel testified that, at the time the videotapes were introduced, he believed the petitioner would be acquitted. He was concerned with the impact that the videotapes would have on the petitioner's business interests if the media showed the tapes out of context, so he made the decision not to object to the gallery shift. In our view, trial counsel made a reasonable, professional decision at that time. Further, a fair assessment of trial counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of trial counsel's challenged conduct, and to evaluate the conduct from trial counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The petitioner's argument on this issue is without merit.

*Schiefelbein II*, 2010 WL 1998744, at *26.

It is a stretch to conclude that trial counsel's business-interests rationale, based on non-legal considerations and apparently arrived at without consultation with his client, qualifies as a strategic decision within the meaning of *Strickland*. *See* 466 U.S. at 689 (explaining that a petitioner alleging ineffective assistance "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound *trial* strategy'" (emphasis added) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Nonetheless, even assuming trial counsel's performance was deficient, Schiefelbein cannot establish prejudice. Because the TCCA did not address prejudice with respect to this claim in its opinion, the relevant decision for this Court's review is that of the post-conviction trial court. *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 462–63 (6th Cir. 2015).

That court found that trial counsel was deficient for facilitating the spectator shift, but that, even absent this deficient performance, there was not a reasonable probability that the jury would have had a reasonable doubt in determining Schiefelbein's guilt:

> The testimony of the victim in this case was extremely powerful. Her version of the actual abuse by the defendant remained unshaken throughout her testimony. She was very forthright in her answers to everyone's questions. Defendant's theory that

the victim made this up just to avoid taking gymnastics was not supported by the evidence. Mr. Schiefelbein was evasive in his answers on cross-examination. His videotapes of the victim, which had over two hundred close-ups of the victim's private areas, demonstrated an obsession for which defendant had no reasonable explanation. Mr. Schiefelbein's position that these close-ups were for training purposes was absurd, especially in the instances where he videotaped the victim while she was adjusting the mat for another gymnast. His responses to the 'perp call' from Detective Breedlove and the victim were incriminating and not the type one would expect from an unjustly accused man.

(Doc. No. 20-2 PageID# 2303, 2307–08.) The post-conviction trial court's prejudice finding is a reasonable application of *Strickland* supported by the evidentiary record. Even if trial counsel had objected to the trial court's decision to screen the spectators from seeing the videos, the jury would still have heard B.R.'s testimony, listened to the audiotape, and seen "over two hundred close-ups of the victim's private areas . . . for which defendant had no reasonable explanation." *Id.* Schiefelbein is not entitled to relief on this claim.

### e. Testimony regarding Schiefelbein's access to video tapes

Schiefelbein claims that trial counsel "failed to object to the trial court's improper striking of his truthful testimony, failed to request a mistrial, and actively condoned this act by the court." (Doc. No. 39, PageID# 6788.) The TCCA ruled on this claim as follows:

[W]hen asked whether he had seen the videotapes [of the gymnasts], the petitioner stated, "I was unable to look at the videotapes in their entirety because of the strict rules the Court put on us." *Schiefelbein*, 230 S.W.3d at 117. During a jury-out hearing on another matter, the trial court suggested instructing the jury to disregard the statement as unresponsive and explained that "the court of appeals may assume that's true because he wasn't corrected on the record." *Id.* Trial counsel then agreed to the instruction, with the caveat that he was not waiving his objection to the trial court's orders concerning discovery of the videotapes. The trial court later instructed the jury "to disregard any comment that the defendant made in his testimony concerning any alleged denial of access to tapes by the Brentwood Police Department prior to today." *Id.* This court has held that a trial court's instruction to disregard a defendant's unresponsive testimony is not an improper comment on the evidence. *State v. Elroy D. Kahanek*, No. 01C01-9707-CC-00298, 1998 WL 345356, at *6 (Tenn.Crim.App., June 30, 1998), *perm. app. denied* (Tenn., Jan. 11, 1999). We are not persuaded that the trial court's instruction constituted an improper comment on the evidence that might have swayed the jury. Because the

instruction was proper, trial counsel's performance was professionally reasonable, and the petitioner is not entitled to relief on this issue.

*Schiefelbein II*, 2010 WL 1998744, at *26. Given Tennessee precedent "that a trial court's instruction to disregard a defendant's unresponsive testimony is not an improper comment on the evidence," *id.* (citing *Kahanek*, 1998 WL 34356, at *6), the TCCA reasonably held that trial counsel's failure to object and to request a mistrial fell within the wide range of competent assistance.[18]

### f. Questioning of prosecution witnesses

Schiefelbein next claims that trial counsel was ineffective for failing to object to the trial judge's questioning of B.R. and her mother. (Doc. No. 39, PageID# 6788–89.)

### i. B.R.

After the defense recalled B.R. to the stand and the prosecution cross-examined her, the trial court asked the following series of questions:

> THE COURT: Okay. Almost finished here, [B.R.]. I have two questions I want to ask you.
>
> THE WITNESS: Okay.
>
> THE COURT: I want you to listen. If you don't understand the questions, let me know. And take your time to think about it. You don't have to just answer. Think about this. You're under oath, which means you're to tell the truth. And you've always been under oath, ever since you've been in the witness chair. [B.R.], what

---

[18] This is so despite the post-conviction trial court's ruling, upon which Schiefelbein relies, that "it is undisputed that trial counsel's performance was deficient as to this issue." (Doc. No. 39, PageID# 6788.) Although the post-conviction court relied on the fact that trial counsel "admitted he should have objected to the [trial court's] instruction to the jury" in concluding that trial counsel's performance was constitutionally deficient, the TCCA's choice to look past that in its deficiency analysis and to focus on the validity of the instruction under Tennessee law was not an unreasonable application of *Strickland*. (Doc. No. 20-4, PageID# 2543–44; Doc. No. 39, PageID# 6788.) Further, the factual finding that Schiefelbein's testimony was unresponsive is implicit in the TCCA's ruling. *See Schiefelbein* II, 2010 WL 1998744, at *26. Schiefelbein has not met his burden of rebutting by clear and convincing evidence the presumption of correctness to which that finding is entitled under AEDPA. 28 U.S.C. § 2254(e)(1).

you have called inappropriate that Mr. Schiefelbein has done to you, have you made any of these things up?

THE WITNESS: No.

THE COURT: Has anyone told you what to say against him?

THE WITNESS: No.

THE COURT: Or has anyone coached you to say things against him about the inappropriate things?

THE WITNESS: No.

THE COURT: Anybody coached you to say that things were inappropriate that he did to you?

THE WITNESS: I don't understand the question very well.

THE COURT: Okay. By the word "coached," I meant basically told you what to say or how to say it against him.

THE WITNESS: No.

(Doc. No. 29-11, PageID# 4465–67.)

The TCCA rejected Schiefelbein's argument that trial counsel was ineffective for failing to object to these "bolstering questions" (Doc. No. 39, PageID# 6788):

> In the post-conviction hearing, trial counsel testified that he did not object because he believed the questioning was proper and would have asked the same questions. In our view, whether or not the questions bolstered the victim's credibility, trial counsel's testimony reflects that he made a reasoned decision not to object; therefore, we find that his performance was not deficient.

*Schiefelbein II* v. State, 2010 WL 1998744, at *29.

Trial counsel testified at the post-conviction hearing that he "did not necessarily feel that the judge was commenting one way or the other on the evidence to either bolster or not bolster the State's case as such . . . ." (Doc. No. 20-4, PageID# 2551.) He further elaborated that:

> [t]he Trial Court has the discretion to - - ask questions of witnesses if it chooses to. It is only if the Trial Court's questioning goes beyond merely questioning and seeks

> to endorse a witness's testimony as such, that a defense attorney should object to the Judge's questioning based upon what happens on the spur of the moment[]. Obviously at trial when the Judge asks a question, you don't know what he's going to ask until after he asks it, and so what you have to do then is on a spur of the moment make a decision as to whether you believe that the Judge may have crossed that line or not. I don't believe in any instances, that . . . I recall, that the Judge crossed that line specifically, and in my opinion would constitute an endorsement."

(Doc. No. 20-5, PageID# 2629–30.) Trial counsel's testimony indicates that he made an in-the-moment judgment that the trial judge's questions were not intended to bolster or endorse the testimony of the victim and therefore chose strategically not to object to those questions. That strategic choice is entitled to deference under *Strickland*. The TCCA's rejection of this claim was neither objectively unreasonable nor based on an unreasonable determination of fact. *See Strickland*, 466 U.S. at 681.

### ii. B.R.'s mother

During her testimony, the trial court asked B.R.'s mother the following question: "Do you know if [B.R.] shared her story about Mark with any of her friends at any time?" (Doc. No. 29-10, PageID# 4261.) B.R.'s mother responded: "Yes, she has." (*Id.*) Schiefelbein argues that trial counsel's failure to object to this question constituted ineffective assistance because the answer was "profoundly damaging to Mr. Schiefelbein." (Doc. No. 39, PageID# 6771, 6789.)

On direct appeal, the TCCA found that this question did not amount to a judicial comment on the evidence. *Schiefelbein I*, 230 S.W.3d 88 at 121. The court reasoned that a trial court has discretion to question witnesses, including to ask jury-submitted questions. *Id.* at 120 (citing Tenn. R. Evid. 614(b); *State v. Bacon*, No. 03C01-9608-CR-00308, 1998 WL 6925, at *16–17 (Tenn. Crim. App. Jan. 8, 1998)). The TCCA found "nothing in the judge's questioning which would leave an improper impression with the jury as to his feelings about the evidence, and the judge

made no statements which would reflect upon the weight or credibility of the evidence, including B.R.'s testimony." *Id.* at 121. It therefore "did not adversely affect the defendant's rights." *Id.*

The TCCA subsequently denied Schiefelbein's post-conviction claim that trial counsel was ineffective for failing to object, declining to find prejudice:

> In his post-conviction appeal, the petitioner again claims that the question amounted to a comment on the evidence, bolstering the victim's credibility by allowing the jury "to consider it for the proposition that the 'story' shared by the alleged victim was, in fact, true." However, as this court has previously found that the question was not a comment on the evidence and did not prejudice the petitioner, we decline to find prejudice now. The petitioner is therefore not entitled to relief on this issue.

*Schiefelbein II*, 2010 WL 1998744, at *30.

Regardless of whether trial counsel was ineffective for failing to object to the court's question,[19] all Schiefelbein has offered to attack the TCCA's holding on the issue of prejudice is the conclusory assertion that the answer to the question was "profoundly damaging." (Doc. No. 39, PageID# 6771, 6789.) Given the strength of the evidence against Schiefelbein, that assertion is insufficient to demonstrate that Schiefelbein is entitled to habeas relief on this claim. The TCCA's holding on this claim was reasonable under AEDPA.

### g. Cumulative error

Finally, Schiefelbein argues that "a reasonable court should find that failure [to object to the term 'vaginal shots'], coupled with the suggested spectator shift, coupled with the consistent failure to object to damning and improper questioning, in the totality denied Mr. Schiefelbein a

---

[19] Schiefelbein offers two other reasons to think that trial counsel's failure to object to the jury-submitted question constituted deficient performance: (1) "it was a 'prior consistent statement,' which may only be introduced 'to rehabilitate a witness when insinuations of a recent fabrication have been made, or when deliberate falsehood has been implied; and (2) "it was double hearsay, in that B.R.'s mother was being asked what she had heard that her daughter had told third parties." (Doc. No. 39, PageID# 6771.)

fair trial, and leaves us without confidence in the verdict." (Doc. No. 39, PageID# 6791.) As discussed above, the TCCA found this claim without merit based on its determinations regarding Schiefelbein's individual ineffectiveness claims. *Schiefelbein*, 2010 WL 1998744, at *31. Without finding more than one instance of deficient performance, there was no error for the TCCA to consider cumulatively. The TCCA's holding on this claim was not an unreasonable application of clearly established law nor was it based on an unreasonable determination of the facts.

### B. Denial of a Public Trial

Schiefelbein also claims that by requiring the "spectator shift," the trial court denied his right to a public trial in violation of the Sixth Amendment. (Doc. No. 39, PageID# 6793.) Respondent contends that this claim is procedurally defaulted. (Doc. No. 18, PageID# 309–10.)

"Procedural default occurs when a petitioner fails to comply with a regularly enforced state court procedural rule that is an adequate and independent ground to bar review of a federal constitutional claim." *Hardaway v. Burt*, 846 F.3d 191, 196 (6th Cir. 2017). A claim may become procedurally defaulted in two ways. First, a claim is procedurally barred when it has been presented to the highest available state court and dismissed, not on the merits, but for failure to comply with a state procedural rule. *Lovins*, 712 F.3d at 295 (citing *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006)). Second, a claim is procedurally defaulted when it has never been presented to the state court and the chance to do so is now foreclosed by a state procedural rule. *Id.* At issue here is the first type of default: on direct appeal, the TCCA found "that the defendant waived his right to a public trial to the extent that what occurred can even be characterized as a 'closure.'" *Schiefelbein I*, 230 S.W.3d at 116. The TCCA based its waiver determination on "the defendant's failures to object to the trial court's actions or otherwise make known his concern." *Id.*

A four-step inquiry determines whether a habeas petitioner's claim has been procedurally defaulted:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that petitioner failed to comply with the rule . . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . . Third, the court must decide whether the state procedural ground is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim . . . . Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Kelly*, 846 F.3d at 828 (quoting *Stone v. Moore*, 644 F.3d 342, 346 (6th Cir. 2011)).

Because both parties agree that the first three steps of the procedural default inquiry are satisfied (Doc. No. 18, PageID# 309–10; Doc. No. 39, PageID# 6795), Schiefelbein must show that there is cause and prejudice to excuse the default or that a miscarriage of justice would result from enforcing it. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see Wainwright v. Sykes*, 433 U.S. 72, 87, 90–91 (1977). Although the Supreme Court has "not identified with precision exactly what constitutes 'cause' to excuse a procedural default," *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000), such relief "must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," including that the procedural default was the result of ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488, 106 (1986).

Schiefelbein offers as cause trial counsel's failure to object to the spectator shift. (Doc. No. 39, PageID# 6795.) Regardless of whether that failure amounts to ineffective assistance that would constitute cause, for the reasons discussed above, Schiefelbein cannot show that there is a reasonable probability that the spectator shift affected the outcome of the trial and, therefore, cannot show prejudice. That conclusion eliminates the possibility that enforcing the default would

result in a miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 327 (1995) (explaining that, to establish that enforcing a default would result in a miscarriage of justice, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," which is a "stronger showing than that needed to establish prejudice"). This claim is therefore procedurally defaulted.

## VI.    Recommendation

In light of the foregoing, the Magistrate Judge recommends that Schiefelbein's amended petition for Writ of Habeas Corpus (Doc. No. 39) be DENIED.

Any party has fourteen (14) days after being served with this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing those objections shall have fourteen (14) days after being served with a copy of them in which to file any response. Fed. R. Civ. P. 72(b)(2). Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

Entered this 28th day of September, 2018.

ALISTAIR E. NEWBERN
United States Magistrate Judge