UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MARK A. SCHIEFELBEIN,

      Petitioner,                               Civil Action No. 3:11-CV-00066

vs.                                            HON. BERNARD A. FRIEDMAN

KEVIN HAMPTON,

      Respondent.
_____/

## ORDER ACCEPTING AND ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING PETITIONER'S APPLICATION FOR A WRIT OF HABEAS CORPUS

In this matter, petitioner Mark A. Schiefelbein has filed an application for a writ of habeas corpus. Magistrate Judge Alistair E. Newbern has submitted a report and recommendation ("R&R") in which he recommends that the Court deny the application. Petitioner has filed timely objections to which respondent has not responded.

Under Fed. R. Civ. P. 72(b)(3), the Court must review de novo those portions of the R&R to which proper objections have been made. In the present case, petitioner objects to the magistrate judge's analysis of his various claims of ineffective assistance of counsel and his claim that he was denied a public trial. Petitioner also objects that the magistrate judge did not address his claim of trial court bias. Having considered all of petitioner's claims, the R&R, and petitioner's objections, the Court agrees with the magistrate judge's analysis and recommendation. The Court shall therefore adopt the R&R and deny the petition.

Petitioner was "convicted . . . of seven counts of aggravated sexual battery and one count of especially aggravated sexual exploitation of a minor." *State of Tenn. v. Schiefelbein*,

230 S.W.3d 88, 96 (Tenn. Crim. App. 2007).[1]  The trial court sentenced him to a twelve-year

prison term on each count, all terms to be served consecutively.  The Tennessee Court of

Criminal Appeals affirmed these convictions over petitioner's many claims of error,[2] but it

---

[1] These charges were based on allegations that petitioner, who was a gymnastics coach at the time, touched his twelve-year old student, B.R., or made her touch him, in criminally sexual ways, sometimes while videotaping her.  *See Schiefelbein*, 230 S.W.3d at 111.  As the R&R recounts the facts of the case in detail, the Court need not do so again here.

[2] As noted by the Tennessee Court of Criminal Appeals, petitioner raised the following issues on direct appeal:

> (1) the trial court erred by failing to require the State to furnish discovery materials to the defendant; (2) the trial court committed reversible error by configuring courtroom seating to shield the public from viewing certain exhibits; (3) the trial court improperly instructed the jury, sua sponte, to disregard certain truthful testimony of the defendant; (4) the trial court's repeated questioning of State's witnesses created an appearance of judicial bias and improperly bolstered the State's case; (5) the trial court committed reversible error in excluding defense-proffered medical testimony that a physical examination of the victim rebutted the occurrence of sexual penetration, contact, or injury; (6) the trial court permitted the introduction of inadmissible and highly prejudicial hearsay and opinion testimony; (7) the trial court erroneously permitted the State to examine the defendant about his knowledge that a "voice stress analysis" could detect stress in an individual's voice; (8) the trial court erroneously instructed the jury that the defendant could be guilty of aggravated sexual battery if he acted intentionally, knowingly, or "recklessly"; (9) the trial court erroneously instructed the jury that the State could prove the mental state for aggravated sexual battery in the disjunctive by showing that the defendant acted intentionally, knowingly, "or" recklessly; (10) the trial judge should be disqualified from further involvement in the case; and (11) the defendant's effective sentence is excessive, illegal, and unconstitutional. As an adjunct to the issues raised on direct appeal, the defendant also pursues Appellate Procedure Rule 10 interlocutory review to bar future prosecution of three related child-rape charges that were severed,

reduced petitioner's sentence from ninety-six to thirty-six years on the grounds that the sentences on six of the counts should be served concurrently. *Id.* at 147. That court later further reduced the sentence to thirty-two years. *See Schiefelbein v. State*, No. M200802467CCAR3PC, 2010 WL 1998744, at *15 (Tenn. Crim. App. May 19, 2010). The Tennessee Supreme Court denied petitioner's application for permission to appeal.

Petitioner later filed a motion in the trial court for post-conviction relief, arguing that his trial attorney was ineffective for various reasons.[3] The trial court denied that motion,

---

> over his objection, from trial of the aggravated sexual battery and especially aggravated sexual exploitation of a minor offenses.

*Schiefelbein*, 230 S.W.3d at 96.

[3] As summarized by the Tennessee Court of Criminal Appeals, petitioner claimed that his trial attorney was ineffective because he

> (1) did not object when the trial court ordered the spectators to move so they could not see the presentation of video evidence; (2) did not object when the trial court ordered that part of the defendant's testimony be stricken from the record; (3) did not obtain a copy of the audio-taped conversation between the petitioner and the victim, object to the recording's admission as evidence, or properly prepare the petitioner for cross-examination about the recording; (4) did not properly object or move for a mistrial during the state's cross-examination of the petitioner; (5) did not lay a proper foundation for the admission of expert testimony; (6) did not object to the trial court's questioning of state witnesses; (7) did not seek an extraordinary appeal when the trial court refused to compel the state to provide copies of videotape evidence; and (8) did not object to the state's use of the term "vaginal shots." Additionally, the petitioner avers that the cumulative effect of trial counsel's deficient performance rendered his trial unfair.

*Schiefelbein v. State*, No. M200802467CCAR3PC, 2010 WL 1998744, at *1 (Tenn. Crim. App. May 19, 2010).

3

and the Tennessee Court of Criminal Appeals affirmed.  The trial court did find that petitioner's

trial counsel was deficient in a number of respects, but it concluded that counsel's errors were

not prejudicial.  As summarized by the court of appeals, the trial court

> found trial counsel deficient in five areas: (1) failing to object to
> the "spectator shift"; (2) failing to object to the trial court's
> impeachment of the petitioner; (3) failing to object to the trial
> court's bolstering the credibility of the victim and her mother; (4)
> failing to prepare the petitioner for cross-examination regarding
> the audiotaped conversation and failing to listen to the tape before
> trial; and (5) failure to move for a mistrial after the trial court
> allowed the state to question the petitioner about voice stress
> analysis. The court found that trial counsel had tactical reasons for
> not objecting to the trial court's questioning of Ms. Fox and Ms.
> Thompson and to the state's use of the term "vaginal shots." The
> court further found that Dr. Yabut's testimony would not have
> amounted to substantive evidence of the petitioner's innocence,
> and therefore, trial counsel was not deficient in failing to provide
> a proper foundation for his testimony. The post-conviction court,
> however, determined that the petitioner did not carry his burden of
> showing that trial counsel's deficient representation prejudiced the
> defense. The court stated that the victim's testimony was
> "extremely powerful," while the petitioner's testimony was evasive
> and did not explain the videotapes or audiotape.

*Schiefelbein*, 2010 WL 1998744, at \*24.  In his appeal of this ruling, petitioner argued that his trial

attorney

> was ineffective in the following instances: (1) failing to object to
> the "spectator shift;" (2) failing to object to the trial court's
> impeachment of the petitioner; (3) failing to obtain a copy of the
> audiotaped conversation, to object to its admission, and to prepare
> the petitioner for cross-examination about it; (4) failing to properly
> object to the state's improper cross-examination of the petitioner
> regarding voice stress analysis and to move for a mistrial; (5)
> failing to lay a proper foundation for expert medical testimony and
> admission of the victim's medical report; (6) failing to object to the
> trial court's questioning of the victim; (7) failing to object to the
> trial court's questioning of state's witnesses; (8) failing to seek an
> extraordinary appeal after the trial court refused to compel the state

4

to copy videotape evidence; and (9) failing to object to the term "vaginal shots." The petitioner further argues that the cumulative effect of trial counsel's errors prejudiced the petitioner.

*Schiefelbein*, 2010 WL 1998744, at *24. The court of appeals analyzed each of these issues and determined that trial counsel's performance was not deficient and/or that his performance, while deficient, did not raise "a reasonable probability that the outcome of the proceeding would have been different." *Id.* at *25 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). The Tennessee Supreme Court again denied petitioner's application for permission to appeal.

In the amended petition in this matter, petitioner asserts the following claims, the first two of which have several subparts (1) judicial bias, (2) ineffective assistance of counsel, and (3) denial of the right to a public trial.

### Judicial Bias

Petitioner's judicial bias claim is based on his contention that the trial judge was biased against him because he (1) "improperly struck [petitioner's] truthful testimony in the presence of the jury"; (2) "ask[ed] questions of [the] State's witnesses, [B.R., the gymnastic's expert, B.R.'s mother, and the social worker], which bolstered the prosecution's case"; (3) denied defense counsel's request "to demonstrate the positioning of the Defendant in relation to her during the 'straddle' maneuver when she alleged he touched her," denied defense counsel's request to have the jurors visit the gym where the alleged touching occurred, "refused to permit expert defense testimony that 'a perfectly normal physical/[genital] exam was not consistent with repeated painful contact with the genitals,'" permitted two instances of improper opinion testimony, permitted improper cross-examination of petitioner regarding "voice stress analysis," permitted B.R. to give hearsay testimony, erroneously ruled that a cross-examination

5

question put to B.R. called for hearsay, asked petitioner questions, and prevented petitioner from offering a school report written by B.R. in which she praised petitioner; (4) "failed to compel the State to provide copies of videotapes taken from [petitioner's] premises, and an audiotape of a conversation between [petitioner] and B.R."; and (5) sentenced petitioner excessively. Am. Pet. at 9-19.

Petitioner objects that the magistrate judge did "not grant . . . relief . . . based on bias of state trial court." Pet.'s Objs. at 22. The magistrate judge did not address the judicial bias claim because he had already done so in an earlier R&R. Petitioner previously moved for summary judgment on his judicial bias claim. *See* docket entry 49. Respondent opposed the motion, petitioner replied, the magistrate judge issued an R&R recommending denial of the motion, petitioner objected, and the Court adopted the R&R over petitioner's objections. The Court's opinion adopting the R&R stated in relevant part:

> In rejecting Petitioner's claim on direct appeal, the Tennessee Court of Criminal Appeals found that, with the exception of the sentence imposed, the aggrieving actions by the trial judge before and during trial were either not improper or were harmless and not prejudicial to Petitioner and, therefore, that they did not warrant reversal. *State v. Schiefelbein*, 230 S.W.3d 88, 112-13, 117-23 (Tenn. Ct. Crim. App. 2007). The court did, however, find that some of Petitioner's sentences should be concurrent rather than consecutive, and thereby reduced Petitioner's effective sentence from 96 to 36 years. *Id*. at 146-47. It also found that the judge abused his discretion by denying a motion to recuse Petitioner filed between the conclusion of trial and his motion for new trial, because some of the judge's actions combined to create a circumstance in which "the judge's partiality is reasonably in doubt." *Id*. at 136-37.
>
> *     *     *
>
> There is no doubt that these cases [*Tumey v. State of Ohio*, 273

6

U.S. 510 (1927), and *In re Murchison*, 349 U.S. 133 (1955)] stand for the proposition that where a judge's bias violates a criminal defendant's right to due process, relief is automatic without regard to any harmless error analysis. *See Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). But neither case supports Petitioner's claim, which arises not from any personal or extrajudicial interest in his conviction by the trial judge, but from an alleged inference of bias based solely on the judge's rulings and conduct. Moreover, Supreme Court precedent clearly establishes that a judge might be disqualified for reasons not grounded in constitutional due process. *See Bracy v. Gramley*, 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (stating that with respect to judicial disqualification, due process is "a constitutional floor, not a uniform standard," and that most disqualifications are covered by "common law, statute, or the professional standards of the bench and bar"); *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 783, 702 (1948) (citing *Tumey*, 273 U.S. at 523, to state that most matters of disqualification do not "rise to a constitutional level"). The state court's implicit ruling in this case that due process did not automatically mandate a reversal of Petitioner's conviction due to the disqualification of the trial court judge was therefore not contrary to clearly established Supreme Court precedent.

Nor was the state court's determination an unreasonable application of Supreme Court precedent. The state court disqualified the trial judge on the basis that his "impartiality might reasonabl[y] [be] questioned" pursuant to a Tennessee Supreme Court ethical cannon. *Schiefelbein*, 230 S.W.3d at 136-37. Although it concerned disqualification under a federal recusal statute, 28 U.S.C. § 455, discussion by the Supreme Court in *Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) is helpful to this analysis. In that case, the court distinguished between judicial dispositions about a case or party that are, for various reasons, inappropriate, and those that are acceptable:

> The judge who presides at trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in

the course of the proceedings ....

*Id*. at 550–51. Accordingly, a judge's behavior during trial that is "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do[es] not support a bias or partiality challenge." *Id*. at 555. The court explained that a judge's "favorable or unfavorable predisposition" that arises from the course of litigation can only be characterized as "bias" or "prejudice" where "it is so extreme as to display clear inability to render fair judgment," or where the judge's comments "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id*. at 551, 555. The court held that the alleged judicial impatience for and animosity toward the criminal defendant in that case, including the judge's evidentiary rulings, questioning of certain witnesses and "anti-defendant tone" during trial, failed to rise to that level. *Id*. at 556. This is particularly enlightening because constitutional due process sets an even higher standard for relief than § 455. *Railey v. Webb*, 540 F.3d 393, 415 (6th Cir. 2008) (holding that Supreme Court precedent did not clearly establish that criminal defendant's due process rights were violated where trial judge was the uncle of the prosecutor). Accordingly, it was not unreasonable for the state court to find that constitutional due process was not violated and did not require the relief sought by Petitioner, despite the finding that disqualification was appropriate under the more stringent ethical standards imposed by the court.

Finally, Petitioner's alternative argument that the state court made an unreasonable determination of the facts regarding judicial bias is without merit. Just like the fact of kinship in *Railey*, the relevant facts in this case—the rulings, comments and actions of the trial judge—are not in dispute, and the Court "can conclude without hesitation that the [state] court made no 'unreasonable determination' of these facts." *Railey*, 540 F.3d at 399. Petitioner's quarrel is with the application of the law to those facts, which the Court has already resolved.

*Schiefelbein v. Morrow*, No. 3:11-CV-0066, 2015 WL 1428340, at *1, 4-5 (M.D. Tenn. Mar. 27, 2015).

The Court reaffirms its ruling on this issue and, for the reasons previously stated,

8

concludes that petitioner's judicial bias claim lacks merit as a basis for habeas relief. Petitioner's objection that the magistrate judge neglected to address his judicial bias claim is overruled.

***Ineffective Assistance of Trial Counsel***

As noted above, this claim has a number of subparts. Petitioner alleges that his trial counsel was ineffective because he (1) failed to object or request a mistrial upon "the trial court's improper striking of [petitioner's] truthful testimony"; (2) "failed to object to the trial judge's bolstering questions of B.R."; (3) "failed to object to the trial judge's questioning of B.R.'s mother, and the elicitation of a prior consistent statement by B.R."; (4) "failed to request a mistrial in response to the 'Voice Stress Questioning' of [petitioner]"; (5) "fail[ed] to object to the terms 'vagina,' 'vaginal area' and 'vaginal shots,' which were used by the prosecution to refer to the general lower torso, hips and pelvic region of fully clothed gymnasts, as well as videotapes of those regions on such fully clothed gymnasts"; (6) "fail[ed] to object to the 'spectator shift'"; and (7) "fail[ed] to obtain an audiotape of [petitioner] speaking with B.R., [failed] to object to the use of this audiotape at trial, and [failed] to prepare [petitioner] to be cross-examined in relation to this audiotape." Am. Pet. at 28-30. Petitioner further argues that "totality of all of counsel's errors amounted to ineffective assistance of counsel." *Id.* at 30.

After meticulously recounting the testimony and other events of the trial and of the post-conviction proceeding, the Tennessee Court of Criminal Appeals analyzed each of these claims under *Strickland v. Washington*, 466 U.S. 668 (1984). *See Schiefelbein*, 2010 WL 1998744, at *25-31.[4] As to each claim, that court found that counsel's performance was not

_____

[4] As the state court correctly observed,

  [t]o establish ineffective assistance of counsel, the petitioner must

9

deficient and/or that petitioner was not prejudiced and therefore affirmed the trial court's decision denying relief. The magistrate judge found that the state court's disposition was reasonable. Petitioner objects to the magistrate judge's analysis of each subpart of his ineffective assistance claim.

The Court feels compelled to reiterate the rigorous standard that applies in evaluating petitioner's arguments. As the Supreme Court has explained,

> [s]ection 2254(d) reflects the view that habeas corpus is a "guard

---

> show that (1) trial counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if trial counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). Prejudice is shown if, but for trial counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id*. at 697; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Also, a fair assessment of trial counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of trial counsel's challenged conduct, and to evaluate the conduct from trial counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad*, 938 S.W.2d at 369. However, deference is given to strategy and tactical decisions only if the decisions are informed ones based upon adequate preparation. *Id*. (citations omitted).

*Schiefelbein*, 2010 WL 1998744, at *25.

10

against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 102-03 (2011). Ineffective assistance claims are particularly difficult to establish, as the Supreme Court further explained:

Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at 123, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

11

*Id*. at 105.

With these standards in mind, the Court now turns to petitioner's objections to the magistrate judge's analysis of his ineffective assistance claims.

### *Audiotape*

First, petitioner argues that the magistrate judge incorrectly analyzed the issue of prejudice stemming from his "claims regarding the audiotape." Pet.'s Objs. at 3-4. The audiotape, which was played for the jury at the trial, was a recording of a telephone call placed by B.R. to petitioner at a police detective's suggestion. Petitioner argues that his attorney was ineffective for not obtaining a copy of the audiotape before trial. The Tennessee Court of Criminal Appeals rejected this claim for the following reasons:

> The petitioner next argues that trial counsel's performance was deficient because he did not obtain a copy of the audiotaped conversation between the petitioner and the victim, did not listen to the audiotape before trial, did not object to the admission of the audiotape, and did not prepare the petitioner for cross-examination about the audiotape. He further contends that trial counsel's deficient performance prejudiced him because the state effectively impeached him on cross-examination. The state responds that trial counsel's performance was reasonable considering he requested a copy of the audiotape that the state did not turn over. The post-conviction court found, as a matter of fact, that trial counsel did not listen to the audiotape prior to trial. The court concluded that trial counsel's performance was deficient but did not prejudice the petitioner. We agree with the post-conviction court.

> The rules of criminal procedure require the state to provide copies of documents and objects, at the defendant's request, that are material to the defense, that the state plans to introduce in its case-in-chief, or that belong to the defendant. Tenn. R.Crim. P. 16(a)(1)(F). Rule sixteen further proscribes that

>> [i]f a party fails to comply with this rule, the court may:

(A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;

(B) grant a continuance;

(C) prohibit the party from introducing the undisclosed evidence; or

(D) enter such other order as it deems just under the circumstances.

Tenn. R.Crim. P. 16(d)(2). Trial counsel testified at the post-conviction hearing that he requested a copy of the audiotape and was under the impression that he would receive a copy before the trial began. Trial counsel's testimony was inconsistent about whether he heard the tape before trial or heard it for the first time at trial. The post-conviction court found that he did not hear it until trial, and the record does not preponderate against that finding. Trial counsel did not take any action to ameliorate the state's failure to comply with the discovery request. Because the audiotape was a key piece of evidence against the petitioner, trial counsel's failure to obtain a copy or mitigate the state's discovery violation constitutes deficient performance.

The petitioner, however, has not carried his burden of showing prejudice. As this court has previously said,

> the customary need for a copy of the audio cassette recording is to permit a comparison with the transcript that the [s]tate intends to offer at trial. In that fashion, any transcription inaccuracies or disputes can be resolved pretrial. In the present case, the defense does not point to any such inaccuracies with the [s]tate's furnished transcript or other specific prejudice warranting relief on appeal.

*Schiefelbein*, 230 S.W.3d at 113. As for the state's cross-examination about voice inflection, the petitioner had the opportunity to hear the audiotape during Detective Breedlove's testimony, several days prior to his own testimony, and the petitioner had a "combative" nature that did him no favors when

13

subjected to a rigorous cross-examination. More importantly, the jury heard the tape and came to its own conclusions as to the credibility of the petitioner. We conclude that trial counsel's deficient performance regarding the audiotape did not render the outcome of the proceedings unreliable; therefore, the petitioner is not entitled to relief on this issue.

*Schiefelbein*, 2010 WL 1998744, at *27.

The magistrate judge found this assessment of the claim to be reasonable in light of the fact that while counsel neglected to obtain a copy of the audiotape before trial, he and petitioner both heard the recording when it was introduced during the state's case-in-chief. As petitioner was not questioned about the recording until he was cross-examined three days later, he had ample time to prepare. Accordingly, the state court of appeals reasonably found that there was no surprise or prejudice attributable to counsel's failure to obtain a copy of the audiotape before trial. To the extent petitioner faults his attorney for failing to prepare him for cross-examination, the state court of appeals reasonably rejected this argument as well. As noted by that court, counsel did in fact take steps to prepare petitioner:

After the state played the audiotaped conversation between the petitioner and the victim at trial, trial counsel and the petitioner discussed the circumstances around the conversation. Trial counsel said [at the post-conviction hearing] that the petitioner was in court when the state played the audiotape for the jury. Trial counsel testified that, at the time of trial, he felt that he had adequately prepared the petitioner for his testimony both on direct and cross-examination. Trial counsel said that the petitioner was "combative," so he tried to advise the petitioner to be less intense.

*Schiefelbein*, 2010 WL 1998744, at *22.

The Court agrees with the magistrate judge's assessment of this claim. The state court of appeals reasonably found that petitioner was not prejudiced by his attorney's failure to

14

obtain the audiotape before trial or to spend additional time preparing petitioner for cross-examination. Further, the Court finds that trial counsel was not deficient in preparing petitioner, as the two listened to the tape together at trial, they discussed it before petitioner was cross-examined, counsel told petitioner the questions he thought the prosecutor might ask, *see id.*, and counsel offered petitioner advice as to how he should comport himself. Petitioner's objections as to the magistrate judge's analysis of this claim are overruled.

### Prosecutor's Use of the Terms "Vagina," "Vaginal Area," and "Vaginal Shots"

In his next objection, petitioner argues that the magistrate judge incorrectly analyzed the issue of prejudice allegedly stemming from his counsel's failure to object to the prosecutor's use of "the terms 'vagina,' 'vaginal area' and 'vaginal shots,' . . . to refer to the general lower torso, hips and pelvic region of fully clothed gymnasts." Pet.'s Objs. at 4-5. The prosecutor used these terms in describing the video recordings made by petitioner at the gym in which he frequently "zoomed in" on B.R.'s clothed pelvic region.[5] Petitioner contends that these

---

[5] On direct appeal, the state appellate court noted:

> In tape A, the defendant "zoomed" the camera in on B.R.'s vaginal area 81 times. In tape B, he focused on her vaginal area 84 times. In one of the 84 shots, B.R. was pushing a mat underneath another student doing a skill on the trampoline. At this point, her legs obstructed a view of her vaginal area. Detective Breedlove testified that as the defendant "zoomed" in on B.R., he stated her name and that she "better get that in, you're totally blowing it now." She placed the mat a couple more times, and the defendant stated her name again and said "hang on to the mat and get it in like you used to, please." B.R. changed positions making her vaginal area visible, and the defendant said, "better, thank you" and then stated the victim's name. Detective Breedlove testified that during another shot of B.R. on tape B, while she was lying down, the defendant was distracted by someone. He told the person to "give [him] a second" as he "zoomed" the camera in on B.R.'s vaginal

terms were factually inaccurate, as the vagina was not visible, and prejudicial because they suggested to the jury "that there was something unlawful and nefarious about the video images." Pet.'s Objs. at 5. The Tennessee Court of Criminal Appeals rejected this claim for the following reasons:

> The petitioner contends that trial counsel provided ineffective assistance by not objecting to the state's repeated use of the term "vaginal shots" in reference to the close-up shots of the victim in the videotapes. The state responds that trial counsel made a tactical decision not to object. We agree with the state. At the post-conviction hearing, trial counsel testified that he believed the term was "proper and fair." Trial counsel stated that he did not believe the term went against the defense theory that the petitioner made the videotapes for legitimate training purposes. Trial counsel's testimony evinced that he made a tactical decision. We conclude, therefore, that trial counsel's performance was not deficient in this regard.

*Schiefelbein*, 2010 WL 1998744, at *31.

The magistrate judge found this assessment of petitioner's claim to be reasonable, particularly in light of the following testimony counsel provided at the post-conviction proceeding:

> When the camera zoomed in on the waist area down, whenever you show the hip pelvic area you're going to show the vagina area also. If you're indicating that the vagina area without any clothes on no, but if you take a video camera shot of the hip pelvic area and the legs are spread apart the vagina area is going to be visible.

R&R at 43 (quoting from PageID.2563).

---

> area. Detective Breedlove testified that the defendant focused on B.R.'s vaginal area 69 times in tape C, five times in tape D, and three times in tape E.

*Schiefelbein*, 230 S.W.3d at 103. Petitioner testified that the purpose the videotapes was to assist him in instructing the students on gymnastics movements.

The Court agrees with the magistrate judge's determination that the court of appeals reasonably rejected this claim. The video recordings introduced into evidence showed many dozens of close-ups of B.R.'s crotch. The Court finds nothing inaccurate or unfair in the prosecutor referring to these as "vaginal shots" or as images of B.R.'s vagina or vaginal area. Whether clothed or unclothed, the name of the body part is the same. The state court reasonably found that counsel did not render ineffective assistance by failing to object to the term and that petitioner suffered no prejudice as a result. Regardless of the prosecutor's use of these terms, the jury viewed the videotapes and reached its own conclusions as to their evidentiary value. Petitioner's objections as to the magistrate judge's analysis of this claim are overruled.

### Voice Stress Analysis

In his next objection, petitioner argues that the magistrate judge incorrectly analyzed the issue of prejudice allegedly stemming from his counsel's failure to request a mistrial when the prosecutor cross-examined him about "voice stress analysis" in connection with the audio recording of the telephone call B.R. made to petitioner at a detective's suggestions (the so-called "perp phone call"). Pet.'s Objs. at 6-7. The state appellate court addressed this issue on direct appeal and in the post-conviction proceeding. On direct appeal, that court stated:

> The defendant contends that the trial court erred by allowing the State to improperly cross-examine him regarding voice stress analysis relating to his voice on the "perp phone call." The following testimony transpired on cross-examination:
>
> > Q. Wouldn't you agree that someone that is shocked or caught off guard, that fact can be detected in their voice?

A. I wouldn't necessarily agree with that.

Q. Have you ever heard of voice stress analysis?

A. I've heard of the concept. I've heard of it, yes.

Q. Are you aware that people can take a recording like this and determine whether or not someone is under stress, similar to that of a lie detector?

A. I don't know anything about it.

Defense counsel objected to this line of questioning on relevance grounds, and the State argued, "It's relevant if [the defendant] is aware of [voice stress analysis] and still believes that stress cannot be heard in someone's voice." The trial court overruled the objection, and the defendant stated that he was not aware that law enforcement agencies could use this tool to detect distress in a person's voice.

* * *

We fail to detect any relevancy to this misleading line of questioning about an unreliable analysis with no proven track record of accuracy. We reject outright the State's argument that the voice stress analysis questions were relevant to impeach the defendant's credibility. The defendant simply maintained that he "wouldn't necessarily agree with" the State's assertion "that someone that [sic] is shocked or caught off guard, that fact can be detected in their voice." This court, most assuredly, disputes the State's assertion; indeed, this court has found nothing to support the state's factual assertion.

The question thus becomes whether the improper cross-examination constitutes reversible error. We believe it does not. In our view, the improper cross-examination neither "affirmatively appear[s] to have affected the result of the trial on the merits," Tenn. R.Crim. P. 52(a), nor "involve[s] a substantial right" of the defendant, Tenn. R.App. P. 36(b).

*Schiefelbein*, 230 S.W.3d at 133-35.

In the post-conviction proceeding, the state court of appeals stated:

18

The record shows that the state asked the petitioner whether he was familiar with voice stress analysis and if he was "aware that people can take a recording like this and determine whether or not someone is under stress, similar to that of a lie detector?" Schiefelbein, 230 S.W.3d at 133. Trial counsel objected on relevance grounds, and the trial court overruled the objection. *Id*. In the direct appeal on this matter, this court stated that "the [s]tate's cross-examination was misleading, factually incorrect, and irrelevant; it should not have been allowed." *Id*. at 134. However, this court did not find reversible error, stating that the cross-examination did not affect the outcome of the trial. *Id*. Whether or not trial counsel's performance was deficient, we conclude that the petitioner has failed to show how any error by trial counsel resulted in prejudice to the defense because, as this court previously found, the outcome of the proceeding was not affected by the improper questioning.

*Schiefelbein*, 2010 WL 1998744, at *28.

The magistrate judge found that the state appellate court's determination that petitioner failed to show prejudice was reasonable. Petitioner objects, arguing that "[t]here is no question that trial counsel should have requested a mistrial" because credibility was a critical issue and that the line of questioning, and the court's overruling of counsel's objection, "implied to the jury that the question was probative of the defendant's truthfulness." Pet.'s Objs. at 6.

The Court agrees with the magistrate judge's assessment of this claim. Certainly, the prosecutor should not have asked about voice stress analysis and the trial court should have sustained counsel's objection. But petitioner was not prejudiced by his counsel's failure to request a mistrial because there was no basis for such a request. In essence, the prosecutor simply asked petitioner if he had heard about voice stress analysis, and petitioner stated that he had heard of it but did not know anything about it. The state appellate court reasonably found that petitioner was not prejudiced by the line of questioning because it did not appear to have

19

affected the outcome of the trial. As the questioning did not affect the outcome of the trial, counsel did not render ineffective assistance by failing to request a mistrial on this basis. The state appellate court therefore also reasonably concluded that petitioner suffered no prejudice under *Strickland*. Petitioner's objections as to the magistrate judge's analysis of this claim are overruled.

### Spectator Shift

In his next objection, petitioner argues that the magistrate judge incorrectly analyzed the issue of prejudice allegedly stemming from his counsel's failure to object to the "spectator shift." Pet.'s Objs. at 7-9. This refers to the trial court's decision to require the spectators to move their seats to one side of the gallery so that they could not see the videotapes when they were played for the jury. Petitioner argues that his attorney should have objected to this "shift," as it signaled to the jury that the videos "were some form of powerful and devastating evidence[] that a normal person could not bear to view." Am. Pet. at 30.

On direct appeal, the state appellate court found that petitioner had waived any argument that the shift deprived him of a public trial because his attorney did not object to it. *See Schiefelbein*, 230 S.W.3d at 116. In the post-conviction proceeding, the state appellate court found no merit to petitioner's *Strickland* claim because he was not prejudiced by his attorney's failure to object. That court stated:

> The petitioner contends that trial counsel provided ineffective representation at trial when he did not object to, and in fact participated in, the trial court's order that spectators in the gallery move so they could not see the videotapes that the jury was viewing. Specifically, the petitioner argues that trial counsel's

20

performance was deficient because he did not preserve the issue for appeal, resulting in waiver of the issue, and did not consider the impact on the jury. He further argues that trial counsel's deficient performance prejudiced the petitioner by positing that this court would have found that the spectator shift constituted a closure of the court, in violation of the right to public trial, and ordered a reversal and new trial. Additionally, the petitioner contends that the spectator shift poisoned the jury against him because the trial court was, in effect, "saying that the videos taken by the [petitioner] of the alleged victim were so horrible that normal people cannot even see it...." The state responds that trial counsel made a reasonable, tactical decision, and his decision did not prejudice the defense.

At the post-conviction hearing, trial counsel testified that, at the time the videotapes were introduced, he believed the petitioner would be acquitted. He was concerned with the impact that the videotapes would have on the petitioner's business interests if the media showed the tapes out of context, so he made the decision not to object to the gallery shift. In our view, trial counsel made a reasonable, professional decision at that time. Further, a fair assessment of trial counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of trial counsel's challenged conduct, and to evaluate the conduct from trial counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The petitioner's argument on this issue is without merit.

*Schiefelbein*, 2010 WL 1998744, at *25-26.

The magistrate judge questions whether counsel's concerns about the possible effect on petitioner's business may qualify as a decision relating to trial strategy. *See* R&R at 46. He notes that *Strickland* commented that a defendant challenging his attorney's performance "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The Court believes that the magistrate judge reads this passage from *Strickland* too narrowly. Earlier in the quoted sentence the Supreme Court stated that a

reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Further, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Viewed in this light, there is nothing unreasonable about petitioner's counsel agreeing with the trial judge's decision to shift the spectators so that the members of the media who were present in the courtroom would not be able to view the videotapes. As the state appellate court noted, counsel believed his client would be acquitted, and he therefore was concerned about the negative effect the media's viewing the videotapes would have on his livelihood. His decision not to object to the shift fell "within the wide range of reasonable professional assistance" that he was providing to his client. It was therefore entirely reasonable for the state appellate court to conclude that petitioner's *Strickland* claim failed on the grounds that counsel's performance was not deficient.

The magistrate judge agreed with the determination of the trial court (as the appellate court did not address the issue) that although counsel's performance was deficient for, among other things, failing to object to the spectator shift, petitioner's *Strickland* claim nonetheless fails for lack of prejudice. The trial court stated:

> The testimony of the victim in this case was extremely powerful. Her version of the actual abuse by defendant remained unshaken throughout her testimony. She was very forthright in her answers to everyone's questions. Defendant's theory that the victim made this up just to avoid taking gymnastics was not supported by the evidence. Mr. Schiefelbein was evasive in his answers on cross-examination. His videotapes of the victim, which had over two hundred close-ups of the victim's private areas, demonstrated an obsession for which defendant had no reasonable explanation.

> Mr. Schiefelbein's position that these close-ups were for training purposes was absurd, especially in the instances where he videotaped the victim while she was adjusting the mat for another gymnast. His responses to the "perp call" from Detective Breedlove and the victim were incriminating and not the type one would expect from an unjustly accused man. This Court simply cannot conclude that trial counsel's deficient performance so prejudiced the defense in this case that the jury would have had a reasonable doubt as to defendant's guilt.

PageID.2307-08.

The Court agrees with the magistrate judge's determination that the state court's finding regarding the lack of prejudice was reasonable. The evidence against petitioner was strong and his defense was weak. The state court reasonably concluded that under these circumstances, there was no likelihood that counsel's failure to object to the spectator shift (assuming this constituted deficient performance) "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Petitioner's objections as to the magistrate judge's analysis of this claim are overruled.

### *Judge's Ruling Striking Petitioner's Testimony*

In his next objection, petitioner argues that the magistrate judge incorrectly analyzed the issue of prejudice allegedly stemming from his counsel's failure to object to the trial judge's ruling striking a portion of petitioner's testimony. Pet.'s Objs. at 9. In its decision on direct review, the state court of appeals explained the background of this issue as follows:

> [T]he defendant complains that the trial court improperly impeached him and struck his testimony, violating his Due Process rights and obstructing the jury's Sixth Amendment factfinding function. He predicates his complaint on the following portion of the State's cross-examination of him:
>
> Q. And this has been—you have been to the Brentwood

23

> Police Department several times with [defense counsel]; is
> that correct?
>
> A. I have been to the Brentwood Police Department with
> [defense counsel] on several occasions.
>
> Q. And you've looked at videotapes?
>
> A. I was unable to look at the videotapes in their entirety
> because of the strict rules that the Court put on us.

Later during the defendant's cross-examination, the court held a
jury-out hearing on another issue, and after this hearing, but before
the jury returned, the court sua sponte proposed a curative
instruction regarding the defendant's comment that he "was unable
to look at the videotapes in their entirety because of the strict rules
that the Court put on [him]." The judge explained, "On appeal, an
argument in the record like that, that the court of appeals may
assume that's true because he wasn't corrected on the record."
Defense counsel replied, "I have no problem with putting that on
the record, except for the fact that I don't want that to be construed
as my agreeing to Your Honor's protective order." The trial judge
then asked if the jury should be instructed to disregard the
statement as being unresponsive, and defense counsel answered,
"Yes." When the jury returned, the court instructed them "to
disregard any comment that the defendant made in his testimony
concerning any alleged denial of access to tapes by the Brentwood
Police Department prior to today."

On appeal, the defendant claims that the trial court's instruction
was error. We decline the defendant's request for relief on this
basis because he created his own predicament both by failing to
object at the appropriate time and by inviting the court to do the
very thing of which he now complains.

*Schiefelbein*, 230 S.W.3d at 116-17. In the post-conviction proceeding, the state court of appeals

stated:

> The state constitution forbids judges from instructing juries on the
> facts of the case. Tenn. Const. art. VI, § 9. "In all cases the trial
> judge must be very careful not to give the jury any impression as
> to his feelings or to make any statement which might reflect upon

the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989). In this case, the record reflects that, when asked whether he had seen the videotapes, the petitioner stated, "I was unable to look at the videotapes in their entirety because of the strict rules that the Court put on us." *Schiefelbein*, 230 S.W.3d at *117*. During a jury-out hearing on another matter, the trial court suggested instructing the jury to disregard the statement as unresponsive and explained that "the court of appeals may assume that's true because he wasn't corrected on the record." *Id*. Trial counsel then agreed to the instruction, with the caveat that he was not waiving his objection to the trial court's orders concerning discovery of the videotapes. The trial court later instructed the jury "to disregard any comment that the defendant made in his testimony concerning any alleged denial of access to tapes by the Brentwood Police Department prior to today." *Id*. This court has held that a trial court's instruction to disregard a defendant's unresponsive testimony is not an improper comment on the evidence. *State v. Elroy D. Kahanek*, No. 01C01-9707-CC-00298, 1998 WL 345356, at *6 (Tenn. Crim. App., June 30, 1998), *perm. app. denied* (Tenn., Jan. 11, 1999). We are not persuaded that the trial court's instruction constituted an improper comment on the evidence that might have swayed the jury. Because the instruction was proper, trial counsel's performance was professionally reasonable, and the petitioner is not entitled to relief on this issue.

*Schiefelbein*, 2010 WL 1998744, at *26.

The magistrate judge found that the state appellate court reasonably concluded that trial counsel's failure to object to this ruling, or to request a mistrial, did not constitute deficient performance under *Strickland*. Petitioner objects that the ruling communicated to the jury that "his testimony was deceitful. . . . [and that they should] not . . . listen to or consider words spoken by [petitioner]." Pet.'s Objs. at 9.

The Court agrees with the magistrate judge's assessment of this claim. Petitioner vastly overstates the case by arguing that the trial judge's ruling amounted to an expression of his view that nothing petitioner said could be believed. Instead, the trial judge instructed the jury

25

to disregard petitioner's single comment that "I was unable to look at the videotapes in their entirety because of the strict rules that the Court put on us." As the state court of appeals noted, Tennessee law permits the trial judge to instruct jurors to disregard a defendant's unresponsive testimony, as this falls within the judge's discretion to regulate "the scope and control of the examination of witnesses." *Kahanek*, 1998 WL 345356, at *6. As in *Kahanek*, the prosecutor asked petitioner a "yes or no" question, and petitioner's comment regarding the court's "strict rules" denying full access to the videotapes was reasonably deemed by the judge to be unresponsive to that question. Petitioner cites no Supreme Court authority, and this Court is aware of none, stating that the trial judge's ruling violated his right to testify or to a fair trial. As the judge's ruling was not improper, petitioner's attorney had no duty to object to it.

Moreover, petitioner has not shown how he was prejudiced. As the judge's ruling was not improper, any objection by counsel would have been futile. Counsel's failure to make a futile objection could not have "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

The Court concludes that this claim has no merit, as petitioner has shown neither that his counsel's performance was deficient nor that he was prejudiced thereby. Petitioner's objections as to the magistrate judge's analysis of this claim are overruled.

### Judge's Questioning of B.R.

In his next objection, petitioner argues that the magistrate judge incorrectly analyzed the issue of prejudice allegedly stemming from his counsel's failure to object to the trial judge's questioning of B.R. Pet.'s Objs. at 10-11. Petitioner argues that the judge's questioning unfairly "bolstered" this witness, and that this prejudiced petitioner because his own

26

and the victim's credibility were critically important. On direct appeal, the state appellate court

provided the following background information regarding the judge's questioning:

> Although B.R. testified during the State's case-in-chief, the defendant recalled B.R. to the stand in his defense. During her testimony, the trial judge held a bench conference, but the record fails to reflect what transpired. Afterwards, the trial judge advised B.R. that the court was going to ask questions, and the trial judge reminded her that she was under oath. The following exchange then ensued:
>
>> Q. [B.R.], what you have called inappropriate that [the defendant] has done to you, have you made any of these things up?
>>
>> A. No.
>>
>> Q. Has anyone told you what to say against him?
>>
>> A. No.
>>
>> Q. Or has anyone coached you to say things against him about the inappropriate things?
>>
>> A. No.
>>
>> Q. Anybody coached you to say that things were inappropriate that he did to you?
>>
>> A. I don't understand the question very well.
>>
>> Q. Okay. By the word "coached," I meant basically told you what to say or how to say it against him.
>>
>> A. No.
>>
>> Q. Thank you. Now, you all have follow-up on any of these three or four questions, if you'd like.
>
> The State then asked a few follow-up questions regarding whether she was told to tell the truth and whether she was telling the truth. B.R. answered affirmatively. The State previously had asked a

27

similar question on its direct examination of B.R. In that instance, the State asked, "[B.R.], would you make this up just so you could get out of going to gymnastics?" B.R. replied, "No, I could never make up something like this."

In applying the *Adkisson* plain error factors in this case, our analysis ends after factor one, "the record must clearly establish what occurred in the trial court." 899 S.W.2d at 641. In the present case, the record is silent as to what transpired during the bench conference held immediately prior to the trial judge questioning B.R. This court may not speculate as to what was discussed, whether defense counsel objected to such questioning, whether defense counsel failed to object for tactical reasons, *see Adkisson*, 899 S.W.2d at 641–42 ("[T]he accused [must not have waived] the issue for tactical reasons"), whether defense counsel requested such questioning, or whether the bench conference regarded another issue. Therefore, because the first factor in *Adkisson* is not satisfied, we do not find plain error.

*Schiefelbein*, 230 S.W.3d at 119-20. In the post-conviction proceeding, the state appellate court stated:

The record reflects that the trial court asked the victim whether she had made up any of her accusations or had been coached to make the accusations. This court, in the direct appeal, found the issue waived because trial counsel did not object and did not find plain error because the trial record was incomplete. We note, however, that in disqualifying the trial judge from further proceedings in this matter, this court referred to "the judge's credibility-bolstering examination of the victim-witness, though itself unworthy of a reversal." *Id*. at 137. In the post-conviction hearing, trial counsel testified that he did not object because he believed the questioning was proper and would have asked the same questions. In our view, whether or not the questions bolstered the victim's credibility, trial counsel's testimony reflects that he made a reasoned decision not to object; therefore, we find that his performance was not deficient.

*Schiefelbein*, 2010 WL 1998744, at *29.

The magistrate judge agreed with the state court's assessment of this claim. He

noted, in addition, that at the post-conviction proceeding trial counsel testified that the trial judge is permitted to ask witnesses questions and that in his view the judge's questions in this case did not amount to improper endorsement of the victim.  *See* R&R at 49-50.

While petitioner objects that the judge's questioning was intended to portray the victim's testimony as "carefully considered and well thought out," Pet.'s Objs. at 10, the Court agrees with the magistrate judge's conclusion that the state court reasonably rejected this claim. The judge's questioning merely asked B.R. to confirm that she had not made up any of her testimony and that she had not been coached.  There was nothing improper in these questions, and petitioner has cited no Supreme Court authority to the contrary.  Therefore, the state court reasonably concluded that petitioner's attorney did not render ineffective assistance by failing to object.  Petitioner's objections as to the magistrate judge's analysis of this claim are overruled.

### *Judge's Questioning of B.R.'s Mother*

In his next objection, petitioner argues that the magistrate judge incorrectly analyzed the issue of prejudice allegedly stemming from his counsel's failure to object to the trial judge's questioning of B.R.'s mother.  Pet.'s Objs. at 11-12.  Petitioner argues that his attorney should have objected when the judge read a juror-submitted question asking B.R.'s mother whether she knew if B.R. had "shared her story about [petitioner] with any of her friends at any time," to which she responded, "Yes, she has."  R&R at 50.  On direct appeal, the state appellate court provided the following background information regarding the judge's questioning:

The defendant also claims that the trial judge improperly asked

29

B.R.'s mother a question that bolstered B.R.'s testimony. After re-cross examination, the trial court allowed the jury to submit in writing proposed questions to the witness. The prosecution and defense counsel silently read each submitted question. The trial judge inquired outside the hearing of the jury whether there were any objections, and both parties replied, "No, Your Honor." Thus, the trial judge read each question to B.R.'s mother, and she answered each one in turn. The defendant now claims that the last question was improper. The trial judge asked, "Do you know if [B.R.] shared her story about [the defendant] with any of her friends at any time?" B.R.'s mother answered, "Yes, she has."

Again, the trial court has discretion to interrogate witnesses, Tenn. R. Evid. 614(b), and in the present case, the trial court examined B.R.'s mother by asking jury-submitted questions. *See State v. Robert Bacon*, No. 03C01–9608–CR–00308, slip op. at 32, 1998 WL 6925 (Tenn. Crim. App., Knoxville, Jan. 8, 1998) (concluding that the trial judge, in asking two questions submitted by the jury, did not comment on the evidence such that it violated the defendant's rights).

We see nothing in the judge's questioning which would leave an improper impression with the jury as to his feelings about the evidence, and the judge made no statements which would reflect upon the weight or credibility of the evidence, including B.R.'s testimony; thus, we find that this contention provides no basis for a reversal because the question did not amount to a judicial comment and did not adversely affect the defendant's rights.

*Schiefelbein*, 230 S.W.3d at 120-21 (footnote omitted). In the post-conviction proceeding, the

state appellate court stated:

The record reflects that the trial court allowed the jury to submit questions, which trial counsel and the assistant district attorney general read silently and made no objection. *Schiefelbein*, 230 S.W.3d at 120-21. The petitioner claimed on appeal that the last question, whether the victim's mother knew if the victim had told her story to her friends, constituted an improper comment on the evidence by the trial court. In reviewing for plain error, this court found that "this contention provide[d] no basis for a reversal because the question did not amount to a judicial comment and did not adversely affect the defendant's rights." *Id*. at 121. In his

30

> post-conviction appeal, the petitioner again claims that the question amounted to a comment on the evidence, bolstering the victim's credibility by allowing the jury "to consider it for the proposition that the 'story' shared by the alleged victim was, in fact, true." However, as this court has previously found that the question was not a comment on the evidence and did not prejudice the petitioner, we decline to find prejudice now. The petitioner is therefore not entitled to relief on this issue.

*Schiefelbein*, 2010 WL 1998744, at *30.

The magistrate judge agreed with the state court's assessment of this claim, and rejected petitioner's argument that his attorney should have objected because the question was "profoundly damaging." R&R at 51. Petitioner objects that the judge's question amounted to unfair bolstering of the victim's testimony, and that the question was not probative.

The Court agrees with the magistrate judge that the state court reasonably rejected this claim. Whether the question was permissible is essentially a matter of state evidentiary rules, which are not a proper basis for assignment of error in a federal habeas action. *See Fetherolf v. Warden, Chillicothe Corr. Inst*., No. 20-3565, 2020 WL 7048192, at *2 (6th Cir. Sept. 17, 2020) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). Petitioner's burden is to show that the ruling was "so fundamentally unfair as to constitute a denial of federal constitutional rights," *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir.1982), and he has not shown that the judge's reading of this jury-submitted question did so. It was therefore reasonable for the state court to conclude that petitioner was not prejudiced by his counsel's failure to object. Petitioner's objections as to the magistrate judge's analysis of this claim are overruled.

### *Cumulative Error*

31

In his next objection, petitioner argues that the magistrate judge incorrectly analyzed the issue of prejudice allegedly stemming from the cumulative effect of his trial counsel's many errors. The state appellate court rejected this claim because it found no merit to any of petitioner's ineffective assistance arguments. *See Schiefelbein*, 2010 WL 1998744, at *31. The magistrate judge found this assessment of the "cumulative error" argument to be reasonable, as does the Court. Petitioner's objection to the contrary is overruled.

### Public Trial

Finally, petitioner objects to the magistrate judge's analysis of his claim that he was denied a public trial by the trial judge's decision to require the spectators in the courtroom to move their seats so that they could not view the videotapes when they were played for the jury. On direct review, the state appellate court rejected this argument for the following reasons:

> The Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution afford an accused the right to a "public trial." *See In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *State v. Sams*, 802 S.W.2d 635 (Tenn. Crim. App.1990). This right is regarded as "a shared right of the accused and the public, the common concern being the assurance of fairness." *Press Enterprise Co. v. Superior Court*, 478 U.S. 1, 7, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986). "Transparency," it has been said, "is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused." *Smith v. Doe*, 538 U.S. 84, 99, 123 S.Ct. 1140, 1150, 155 L.Ed.2d 164 (2003). The right to a public trial is not absolute, however, and in certain cases must yield to other rights or interests. *See Waller v. Georgia*, 467 U.S. 39, 45, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984).

> The defendant in this case constructs an argument that his due process and public trial guarantees under the federal and state constitutions were abridged because the trial judge excluded the public from viewing the videotapes of gymnastics which showed the victim. The public was excluded, the defendant insists, because

32

when the videotapes were identified and played, the trial judge forced the public spectators on numerous occasions to "shift" to another part of the courtroom to ensure that they could not see the evidence. The State, for its part, does not dispute that the trial judge screened the media and public from viewing videotapes of the victim by arranging the courtroom so that only the jury, witnesses, the defendant, and attorneys could see the videotapes. Instead, the State maintains that the defendant waived the issue by failing to object and, indeed, by being the instigator of the seating arrangement. The State also asserts that the trial judge's actions conformed to Tennessee Supreme Court Rule 30(C)(1) which forbids media coverage in any judicial proceeding "of a witness, party, or victim who is a minor." Tenn. Sup. Ct. R. 30(C)(1).

We begin by examining the context in which this issue arose. In a jury-out hearing during Detective Breedlove's testimony, the parties and the court discussed various aspects of how and what portions of the videotapes would be played for the jury. Defense counsel addressed the trial court as follows:

> MR. JOHNSON: Your Honor, please, one of the reasons that in an earlier hearing General White raised about providing copies to us was the potential revictimization of the victim if it got released outside. I know there [are] members of the public sitting out there, and they are obviously interested in the tapes. And what is—is it Your Honor's intention for them also to be allowed to see the tapes in light of the General's objection that she didn't want the victim to be revictimized by this? Or does the public have the right to see the video tapes? ...

> GENERAL WHITE: The public has a right to be in the courtroom. There is no provision from barring them from being in the courtroom. I will defer to the court on the other issue whether or not Your Honor wants to make them sit down. But I know that in these type of cases there's always public in the courtroom and there is no provision in the law to bar them from a public courtroom.

> MR. JOHNSON: As I indicated earlier my only concern was that earlier the General had argued against us getting copies based on the potential for revictimizing the victim, by letting other people outside of the immediate parties see

33

these video tapes.

THE COURT: All right. I guess I'll first start with the media. Who here is from the media? Stand up. All right, and ma'am you're the last person from the media that is here?

UNIDENTIFIED SPEAKER: They are out in the hallway.

THE COURT: In the hallway? You're with whom?

UNIDENTIFIED SPEAKER: With Channel 4.

THE COURT: You're with Channel 4. Probably, the other media folks ought to come in here because I am just going to ask y'all what y'all want and that will tell me what I need to decide....

....

THE COURT: I appreciate you bringing that up, Mr. Johnson, that was very nice. Okay. Is that everybody? We got Channel 4, we got FOX 17.... So. 4 and 17. Now 2 and 5 are not here, they were here yesterday.

....

THE COURT: Right, I was going to let y'all sit over there and you can hear and watch the jury, but Mr. Johnson has a good point, we don't want a, quote revictimization, or alleged revictimization of alleged victim at this time. This case is in progress and it is hard enough as it is. So but the rule—I'm giving deference to Supreme Court Rule 30, so I'm wondering if you have any problem with it, sitting over here and not watching this?

UNIDENTIFIED SPEAKER: I would just say if the public at large is allowed to watch, we should be allowed to watch too.... That would be my only argument.

THE COURT: I can make a decision about the public at large without asking. I think Mr. Johnson has a good point. I don't want to see this child or another child, we used the

34

term revictimized and ... I'm also by saying that that I am recognizing that the defendant is presumed innocent.... So by saying all that I'm ruling that I'm going to ask the public and media, you may stay in the courtroom during this process but I don't want you seeing this video tape. You can hear about it, but I don't want you watching it at this time. So maybe if I can get you all over in that section. Thanks. So the camera and the audio pickup is off.

....

THE COURT: Once we start we need to have a deputy posted at the door and stop them until a break.... So, why don't I get the court officers to go out there and see if there is anyone [who] wants to be in the courtroom now, they need to come in.... Mr. Johnson, if you want to weigh in on any of these instructions up to now, you may. Do have any objection to the way the Court has handled it up to now.

MR. JOHNSON: No, Your Honor.

The trial transcripts also reflect several additional times when the court directed members of the audience to move.

We are not persuaded initially that a complete or partial closure of the courtroom occurred in this case.

A complete closure has the effect of excluding everyone from the courtroom with the exception of the parties, the attorneys, court personnel, and the witnesses. A complete closure may be for the entire trial or proceeding, or a portion of the proceedings such as the testimony of a particular witness. A partial closure results in the exclusion of certain members of the public while other members of the public are permitted to remain in the courtroom.

*Sams*, 802 S.W.2d at 639. No members of the media or public were barred from the courtroom in this case, and the State noted specifically on the record that the public had a right to be in the courtroom. To be sure, the trial court arranged the courtroom to screen the media and public from viewing videotapes of the victim, but courtroom spectators often are disadvantaged in viewing trial exhibits as they are offered and introduced. Furthermore, the

record discloses that the only media objection was couched in terms of equal treatment for the media and the public. *See Wilbert Rogers v. State*, No. W2004–00654–CCA–R3–PC, slip op. at 3–4, 2005 WL 525268 (Tenn. Crim. App., Jackson, Feb. 22, 2005) (declining to find closure of judicial proceedings because trial judge had his court open, even though other courts were apparently closed due to weather; weather-related closing of other court-rooms did not result in denial of a public trial).

The defense cites to no authority describing what happened in this case as a complete or partial closure of trial proceedings. However, even if the right to a public trial was somehow implicated, we believe the issue is resolved by the defendant's failures to object to the trial court's actions or otherwise make known his concern. Therefore, we conclude that the defendant waived his right to a public trial to the extent that what occurred can even be characterized as a "closure." *State v. Tizard*, 897 S.W.2d 732 (Tenn. Crim. App. 1994) (finding waiver when defendant failed to object to trial court's exclusion of journalism students during the cross-examination of the victim involving vulgar references to masturbation).

The defendant insists that he did not waive any rights and that the State has taken "completely out of context" his negative response to the trial court's inquiry whether he objected "to the way the Court has handled it up to now." We disagree; from the transcript, it is altogether reasonable to conclude that a waiver occurred. At any rate, even if the trial court and defense counsel were discussing some other matter, such as instructions to the media, the record plainly discloses that the defense did not object when the seating arrangement was being discussed at an earlier point. Finally, even if the defense broached the subject tongue-in-cheek to highlight the inequity of the trial court's restrictions on defense discovery, the defense was not thereby relieved of the obligation of formally objecting to the seating arrangement orchestrated by the trial court.

In summary, the defendant is not entitled to a new trial regarding any claimed violation of his right to a public trial.

*Schiefelbein*, 230 S.W.3d at 114-16 (footnote omitted).

The magistrate judge found that petitioner has procedurally defaulted this claim,

36

based on the appellate court's finding that his attorney failed to object to the trial court's proposal to "shift" the spectators. R&R at 52-54. Petitioner objects, arguing that this claim has not been defaulted and that the magistrate judge analyzed this issue incorrectly. *See* Pet.'s Objs. at 15-20.

Rather than engage in the cause and prejudice analysis to determine whether the claim has been procedurally defaulted, the Court finds that it is more straightforward to reject this claim on the merits, as the state appellate court did in the alternative. As noted, that court found that petitioner "cite[d] to no authority describing what happened in this case as a complete or partial closure of trial proceedings." *Id.* at 116. This Court agrees.

As the state appellate court correctly noted, the Sixth Amendment guarantees a criminal defendant "the right to a speedy and public trial." U.S. CONST. amend. VI. "It is the law of the land that no man's life, liberty or property be forfeited as a punishment until there has been a charge fairly made and fairly tried in a public tribunal," and therefore no criminal trial may be conducted in secret. *In re Oliver*, 333 U.S. 257, 278 (1948). The Supreme Court has observed that public access to criminal proceedings is "essential to the proper functioning of the proceedings in the overall criminal justice process," and therefore the press ordinarily cannot be excluded. *Press-Enter. Co. v. Superior Ct. of Cal. for Riverside Cty.*, 478 U.S. 1, 12 (1986). "[O]ur criminal law tradition insists on public indictment, public trial, and public imposition of sentence." *Smith v. Doe*, 538 U.S. 84, 99 (2003).

In *Waller v. Georgia*, 467 U.S. 39, 44-46 (1984), the Supreme Court explained the First and Sixth Amendment rights at issue as follows:

This Court has not recently considered the extent of the accused's

37

right under the Sixth Amendment to insist upon a public trial, and has never considered the extent to which that right extends beyond the actual proof at trial. We are not, however, without relevant precedents. In several recent cases, the Court found that the press and public have a qualified First Amendment right to attend a criminal trial. *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). We also have extended that right not only to the trial as such but also to the voir dire proceeding in which the jury is selected. *Press–Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). Moreover, in an earlier case in this line, *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), we considered whether this right extends to a pretrial suppression hearing. While the Court's opinion did not reach the question, *id.*, at 392, 99 S.Ct., at 2911, a majority of the Justices concluded that the public had a qualified constitutional right to attend such hearings, *id.*, at 397, 99 S.Ct., at 2914 (POWELL, J., concurring) (basing right on First Amendment); id., at 406, 99 S.Ct., at 2919 (BLACKMUN, J., joined by BRENNAN, WHITE, and MARSHALL, JJ., dissenting in part) (basing right on Sixth Amendment).

In each of these cases the Court has made clear that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such circumstances will be rare, however, and the balance of interests must be struck with special care. We stated the applicable rules in Press–Enterprise:

> "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." 464 U.S., at 510, 104 S.Ct., at 824.

*Accord*, *Globe Newspaper Co., supra* 457 U.S., at 606–607, 102 S.Ct., at 2620–2621; *Richmond Newspapers, supra*, 448 U.S., at

580–581, 100 S.Ct., at 2829–2830 (opinion of BURGER, C.J.); *Gannett*, 443 U.S., at 392–393, 99 S.Ct., at 2911–2912 (semble); *id*., at 400–401, 99 S.Ct., at 2916–2917 (POWELL, J., concurring); id., at 440–446, 99 S.Ct., at 2936–2939 (BLACKMUN, J., dissenting in part).

As noted, the analysis in these cases has proceeded largely under the First Amendment. Nevertheless, there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public. The central aim of a criminal proceeding must be to try the accused fairly, and "[o]ur cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant." *Gannett*, 443 U.S., at 380, 99 S.Ct., at 2905.

" ' "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions...." ' " *Ibid*. (quoting *In re Oliver*, 333 U.S. 257, 270, n. 25, 68 S.Ct. 499, 506, n. 25, 92 L.Ed. 682 (1948), in turn quoting T Cooley, Constitutional Limitations 647 (8th ed. 1927)).[4]

In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury. *See In re Oliver, supra*, at 270, n.24, 68 S.Ct. 499, 506, n.24, 92 L.Ed. 682; *Douglas v. Wainwright*, 714 F.2d 1532, 1541 (CA11 1983), cert. pending, Nos. 83–817, 83–995; *United States ex rel. Bennett v. Rundle*, 419 F.2d 599, 606 (CA3 1969).

---

[4] Accord, *Estes v. Texas*, 381 U.S. 532, 588, 85 S.Ct. 1628, 1662, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring) ("Essentially, the public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings"); *In re Oliver*, 333 U.S., at 270, 68 S.Ct., at 506 ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power").

*See also Johnson v. Sherry*, 586 F.3d 439, 443 (6th Cir. 2009) ("Because of the great, though

39

intangible, societal loss that flows from closing courthouse doors, the denial of a right to a public trial is considered a structural error for which prejudice is presumed") (citations omitted), *abrogated by Weaver v. Massachusetts*, 137 S. Ct. 1899, 198 L. Ed. 2d 420 (2017).

The right to a public trial is incontestable. However, the state appellate court reasonably concluded that petitioner's right to a public trial was not violated. In all of the cited cases in which this right was implicated, the public was prevented from observing the trial or related proceeding.[6] Nothing comparable occurred in this case. No member of the press or public was excluded from the courtroom during the trial or any related proceeding. The press and public were simply required to move their seats to one side of the courtroom while the videotapes were played for the jury. Whether this move was necessary in order to prevent B.R. from being "revictimized," as the trial judge indicated, is debatable. But it is clear that this "spectator shift" did not violate petitioner's right to a public trial. Certainly, the state appellate court's conclusion that no "complete or partial closure of trial proceedings" occurred, *Schiefelbei*n, 230 S.W.3d at 116, is not "contrary to . . . clearly established Federal law, as

---

[6] *See Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) (public excluded during voir dire of jurors); *Press-Enter. Co. v. Superior Court of Cal. for Riverside Cty.*, 478 U.S. 1 (1986) (public and press excluded from defendant's preliminary hearing); *Waller v. Georgia*, 467 U.S. 39 (1984) (public excluded from defendants' suppression hearing); *Press–Enterprise Co. v. Superior Ct. of Cal.*, 464 U.S. 501 (1984) (press and public excluded from voir dire of jurors); *Globe Newspaper Co. v. Superior Ct. for Norfolk Cty.*, 457 U.S. 596 (1982) (press and public excluded from defendant's trial); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (press and public excluded from defendant's trial); *Gannett Co. v. DePasquale*, 443 U.S. 368 (1979) (public and press excluded from defendants' suppression hearing); *In re Oliver*, 333 U.S. 257 (1948) (defendant convicted of contempt in judge's chambers); *Johnson v. Sherry*, 586 F.3d 439 (6th Cir. 2009) (public excluded from trial while certain witnesses testified); *Douglas v. Wainwright*, 714 F.2d 1532 (11th Cir. 1983) (public excluded during the testimony of one witness); and *United States ex rel. Bennett v. Rundle*, 419 F.2d 599 (3d Cir. 1969) (public excluded from defendant's suppression hearing).

40

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Petitioner's objections as to this claim are overruled.

### Conclusion

For the reasons stated above, the Court agrees with the magistrate judge's conclusion that the state court's rejection of petitioner's claims of judicial bias, ineffective assistance of counsel, and denial of the right to a public trial was neither contrary to clearly established Supreme Court precedent nor based on an unreasonable determination of the facts. Plaintiff's contrary objections are overruled. Accordingly,

IT IS ORDERED that Magistrate Judge Newbern's R&R is hereby accepted and adopted as the findings and conclusions of the Court, with the exceptions as noted above.

IT IS FURTHER ORDERED that petitioner's application for a writ of habeas corpus is denied.

IT IS FURTHER ORDERED that no certificate of appealability shall issue, as petitioner has failed to make a substantial showing that any of his constitutional rights have been violated.

s/Bernard A. Friedman
_____
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE
SITTING BY SPECIAL DESIGNATION

Dated:   January 15, 2021
          Detroit, Michigan